Wilfred **KEYES** et al.,
Plaintiffs,

v.

**SCHOOL DISTRICT NO. 1, DENVER,
COLORADO**, et al., Defendants,

Congress of Hispanic Educators et al.,
Intervenors.

**Civ. A. No. C–1499.**

United States District Court,
D. Colorado.

April 8, 1974.

Order April 24, 1974.

James M. Nabrit, III, New York City, Holland & Hart, by Gordon G. Greiner, Robert T. Connery, Denver, Colo., for plaintiffs.

Wood, Ris & Hames, by William K. Ris, Henry, Cockrell, Quinn & Creighton, by Michael H. Jackson, Denver, Colo., for defendants.

Mexican American Legal Defense and Educational Fund, by Vilma S. Martinez, Sanford J. Rosen, San Francisco, Cal., Paul A. Baca, Carlos M. Alcala, Denver, Colo., for Congress of Hispanic Educators, and others.

Hobbs & Waldbaum, by Larry F. Hobbs, Jeannine Bradley Volz, Denver, Colo., for Montbello Citizens' Committee, Inc.

Ronald C. Butz, Richard H. Plock, Jr., Denver, Colo., for Moore School Community Assn. and Moore School Lay Advisory Committee.

Legal Aid Society of Metropolitan Denver, by Michael R. Enwall, North Denver Legal Services, James W. Wilson, Frederick P. Charleston, Eastside Legal Services, Denver, Colo., for United Parents of Northeast Denver, a non-profit corporation, and others.

Clark, Benson & Vernon, P. C. by Thomas Quentin Benson, Colin M. Clark, Denver, Colo., for Citizens Assn. for Neighborhood Schools, an unincorporated association.

Martinez & C De Baca, by Roy R. Martinez, Armando C De Baca, Denver,

Colo., for Concerned Citizens for Quality Education.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, Circuit Judge.

This is one more (and hopefully the final) episode in the Denver school desegregation case. The object of the present trial has been determination of a just, equitable and feasible plan for the desegregation of the schools in accordance with the mandate of the Supreme Court requiring elimination of invidious discrimination and the deprivation of equal educational opportunity.

The scope and magnitude of the problem is evidenced by the numbers and ethnic origins of students as of September 28, 1973. In the elementary schools there were 46,060 students, including 17.6% black, 27% Spanish surnamed and 54.1% Anglo. The total enrollment in the junior high schools on the same date was 21,018, including 18.5% black, 24% Spanish surnamed and 56.6% white. The senior high schools totaled 20,542. The percentage of black students was 17.3%, that of Spanish surnamed students was 17.8% and that of Anglo students was 63.8%.

Segregation exists in minority schools on the one hand and non-integration of Anglo schools on the other throughout the District. There tends to be extreme concentrations of minority students at the north end of the District and equally high concentrations of white students in the middle and progressively to the south part of the District. In general, Hispano (Chicano) families live on the west side of the District. Here again, there are highly concentrated schools, although many of the schools even though segregated are somewhat less concentrated than the black schools. Some of these Chicano schools lend themselves to integration without transportation.

It is to be noted that the School District and the city are coterminous and have an area of 100 square miles.

The cause has been in litigation since the action was filed in June 1969. Following a preliminary trial, a partial desegregation plan was adopted in the northeastern sector of Denver. This was a plan which had been first adopted by the then School Board. Soon after adoption of the plan by the Board, there was a School Board election which resulted in two of the members of the School Board who had voted in favor of the plan being defeated. Immediately the newly elected members brought about the repudiation of the Resolutions which would have produced partial desegregation. This triggered the filing (in June 1969) of the present suit. A hearing on a preliminary injunction was held and various subsequent trials and hearings were conducted on the merits and on the adoption of an appropriate plan. At the same time, there were circuit court appeals,[1] and the cause has been before the Supreme Court of the United States for partial as well as full-scale review. *See* Keyes v. School District No. 1, Denver, Colorado, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The published decisions showing some of the background leading to the present controversy are set forth below.[2]

Writing for the majority of the Supreme Court Mr. Justice Brennan noticed numerous evidences of pervasive *de jure* segregation and reversed the cause for

1. 445 F.2d 990 (10th Cir. 1971). An order entered remanding the case to the district court was not published.

2. 303 F.Supp. 279 (D.C.Colo.1969) (the preliminary injunction) ; 303 F.Supp. 289 (D.C. Colo.1969) (supplemental findings in the pre- liminary injunction matters) ; 313 F.Supp. 61 (D.C.Colo.1970) (judgment entered for plaintiffs on the first claim and in favor of defendants on all but one count of the second claim ; this was tried on the merits) ; 313 F.Supp. 90 (D.C.Colo.1970) (opinion issued on the remedy on May 21, 1970).

the purpose of a determination by this court as to whether the *de jure* segregation which had been found in the northeastern quadrant of Denver was independent, isolated and unrelated to the segregation conditions present in the rest of the School District.[3]

Following the Supreme Court decision which was rendered in June 1973, rehearing denied, 414 U.S. 883, 94 S.Ct. 27, 38 L.Ed.2d 131 (1973), and the remand, a further evidentiary hearing was held in accordance with the remand.

In its December 1973 decision, using the guidelines which had been furnished by the Supreme Court decision, this court ruled that the Park Hill segregation was not an isolated and independent condition and consequently that it was to be concluded (from the Supreme Court mandate) that the entire system was subject to the identical condition present in Park Hill, *i. e., de jure* segregation, and that this (in accordance with the Supreme Court's decision) required that there be desegregation "root and branch." Following this decision, a further pretrial hearing occurred on December 17, 1973. Each of the parties was given approximately 30 days from the date of the December 17, 1973 hearing to submit a plan for the desegregation of the Denver schools. Subsequently, such plans were duly filed, as were objections by each of the parties. At a further trial of two weeks' duration from February 19, 1974 to March 4, 1974, evidence was presented with respect to the tendered plans.

The principal parties offered evidence in explanation and support of their tendered plans and offered in addition evidence criticizing the plan of the adverse party. Various intervenors representing virtually all possible viewpoints in the community presented testimony and exhibits as to their particular problems arising from possible adoption of one or the other of the plans.

## THE SCHOOL DISTRICT'S PROPOSED PLAN

The School District's plan which was entitled "A Plan for Expanding Educational Opportunity in the Denver Public Schools" has four sections. Section I deals with integration of the professional staff through reassignment and retraining; II with integration of the student body and changes in the use of facilities; III with integration of the student body through new programs; and IV with integration through programs, activities and related improvements.

The percentage guides for desegregation adopted by the Board were a minimum of 25% Anglo in each school and a maximum of 75%. Applying those figures it said that there existed a total of 53 elementary schools within the range and thus by this standard integrated.

There were (said the plan) 17 schools which had less than 25% minority students and a total of 22 schools which had a predominantly majority percentage of Anglos, that is to say, in excess of their 75% maximum.

The plan sought to close eleven schools and transfer the students attending these schools to other schools for the avowed purpose of improving either integration or educational opportunity. In addition to the eleven elementary schools which were recommended to be closed, the Board proposed to close one junior high school and older sections of two elementary schools. As a result of all proposed closings there resulted a transfer of 4165 students to other facilities.

As a result of the School District's proposed elementary school closings and the reassignments, there were fifty-four schools (instead of the former fifty-three) with an Anglo enrollment of twenty-five to seventy-five percent. There were thirteen schools not touched which remained predominantly minority

3. This court had ordered desegregation but had done so on the basis that the separate minority schools offered unequal educational opportunities. The Supreme Court was dissatisfied with this legal approach.

in that their Anglo enrollment was less than twenty-five percent (and in most instances substantially less).[4] Fourteen schools continued to have concentrated majority or Anglo percentages.[5]

Thus, the plan made no effort whatever to desegregate or to integrate the above schools except for the three week, half-day sessions each semester at the enrichment center.

As noted, the School District made some effort to integrate several less highly concentrated schools by the closings in the central part of the city.

Following is the School Board's summary analysis of school closings and resulting enrollment figures:

### WESTWOOD

Westwood's 603 pupils, 35.3% of which were minority, would be transferred to Force, Godsman, Goldrick and Schenck. The Anglo percentage at Force was reduced from 72.3% to 63.2%; at Godsman, from 73.2% to 62.6%; at Goldrick, 75.0% to 68.9%; at Schenck, from 64.4% to 58.9%. Thus, at best the closing of Westwood and the transfer of students brought about a slight reduction of the Anglo percentage in these schools.[6]

### SHERMAN

Sherman School, with an Anglo percentage of 61.1% was proposed to be closed and its 208 students were to be transferred to Fairmont which had an enrollment of 647. As a result of this, Fairmont's percentage of Anglo students would have been raised from 15.3% to 26.4%.[7]

---

4. These minority schools and their projected Anglo composition are listed as follows:

| SCHOOL | ANGLO % |
| --- | --- |
| Bryant-Webster | 19.1% |
| Columbine | 1.0% |
| Del Pueblo | 11.6% |
| Fairview | 8.8% |
| Garden Place | 15.2% |
| Gilpin | 1.5% |
| Greenlee | 10.2% |
| Harrington | 3.3% |
| Mitchell | 2.9% |
| Smedley | 14.2% |
| Smith | 1.9% |
| Whittier | 1.4% |
| Wyatt | 3.1% |

5. There remained fourteen schools with a predominantly majority percentage. These were:

| SCHOOL | ANGLO % |
| --- | --- |
| Ash Grove | 90.9% |
| Berkeley | 80.7% |
| Bradley | 93.2% |
| Bromwell | 91.2% |
| Dennison | 83.8% |
| Holm | 91.1% |
| Kaiser | 94.0% |
| McMeen | 88.0% |
| Pitts | 95.7% |
| Sabin | 80.2% |
| Samuels | 93.8% |
| Slavens | 89.3% |
| Thatcher | 76.7% |
| Traylor | 92.8% |

6. The School Board's columnar analysis is as follows:

| SCHOOL | PRESENT TOTAL ENROLLMENT | PROJECTED TOTAL ENROLLMENT | PRESENT ANGLO % | PROJECTED ANGLO % |
| --- | --- | --- | --- | --- |
| Westwood (to be closed) | 603 | 0 | 35.3% | 0 |
| Force | 627 | 827 | 72.3% | 63.2% |
| Godsman | 387 | 537 | 73.2% | 62.6% |
| Goldrick | 512 | 808 | 75.0% | 68.9% |
| Schenck | 551 | 679 | 64.4% | 58.9% |

7.

| SCHOOL | PRESENT TOTAL ENROLLMENT | PROJECTED TOTAL ENROLLMENT | PRESENT ANGLO % | PROJECTED ANGLO % |
| --- | --- | --- | --- | --- |
| Sherman (to be closed) | 208 | 0 | 61.1% | 0 |
| Fairmont | 647 | 855 | 15.3% | 26.4% |

## BOULEVARD

The Board also proposed to close Boulevard School which had 27.0% Anglo enrollment and 259 total students. The proposal was to transfer the Boulevard students to Ashland with the result of decreasing the Anglo percentage in Ashland from 32.1% to 30.4%.[8]

## CROFTON

Crofton Elementary School was proposed to be closed and its 285 minority students of a total of 287 were to be reassigned to Bradley, Ellis and Fallis. The Anglo percentage at Bradley was thereby reduced from 93.2% to 83.7%. The Anglo percentage at Ellis was reduced from 81.9% to 66.8% and the Anglo percentage at Fallis was reduced from 86.7% to 74.1%.[9]

## EBERT

Ebert School with an Anglo percentage of 10.1% of 268 students was proposed to be closed. Its students were divided up among Lincoln, Steele and Washington Park Schools. The Anglo percentage at Lincoln which totaled 76.3% was thereby reduced to 69.1%. That of Steele which had been 70.6% was reduced to 59.1%. That of Washington Park which had been 83.0% was reduced to 66.1%.[10]

## MOORE

It was proposed that Moore Elementary School would be closed and its 425 students, 72.7% of which were Anglo, were to be transferred to Hallett School which had an Anglo percentage of 19.8%. This closing and reassignment resulted in Hallett's becoming a desegregated school with a 55.9% Anglo enrollment.[11]

## STEVENS

Similarly, Stevens School with 69.4% Anglo students and a total number of 278, was proposed to be closed and its student body was assigned to Stedman

| SCHOOL | PRESENT TOTAL ENROLLMENT | PROJECTED TOTAL ENROLLMENT | PRESENT ANGLO % | PROJECTED ANGLO % |
|---|---|---|---|---|
| 8. The School Board's columnar analysis is as follows: | | | | |
| Boulevard (to be closed) | 259 | 0 | 27.0% | 0 |
| Ashland | 501 | 760 | 32.1% | 30.4% |
| 9. | | | | |
| Crofton (to be closed) | 287 | 0 | .7% | 0 |
| Bradley | 811 | 904 | 93.2% | 83.7% |
| Ellis | 629 | 773 | 81.9% | 66.8% |
| Fallis | 294 | 344 | 86.7% | 74.1% |
| 10. | | | | |
| Ebert (to be closed) | 268 | 0 | 10.1% | 0 |
| Lincoln | 481 | 540 | 76.3% | 69.1% |
| Steele | 367 | 452 | 70.6% | 59.1% |
| Washington Park | 407 | 531 | 83.0% | 66.1% |
| 11. | | | | |
| Moore (to be closed) | 425 | 0 | 72.7% | 0 |
| Hallett | 257 | 644 | 19.8% | 55.9% |

School with 169 students and a 5.9% Anglo percentage so that the acquisition gave Stedman 396 students, 48.2% of which were Anglo.[12]

## COLLEGE VIEW

It was recommended that College View School with a total of 343 students, 64.7% of which were Anglo, should be closed and its students assigned to Gust School which had 448 students and an 81.0% Anglo enrollment. This closing and reassignment gave Gust a total of 791 students, 74.0% of which were Anglo.[13]

## EMERSON

Emerson Elementary School with 172 students, 54.1% of which were Anglo, were in the plan to be assigned to Wyman School which had 273 students, 27.5% of which were Anglo. The resultant number and percentage for Wyman was 445 students, 37.8% Anglo.[14]

## ELLSWORTH

Ellsworth with 91 students, 64.8% being Anglo, was to be closed and its entire student body assigned to Steck School which had 335, 77.6% being Anglo. The result of this transfer was that Steck would have had 426 students and an Anglo majority of 74.9%.[15]

## ELYRIA

Elyria School was to have been closed with 91 students, 16.5% of which were Anglo. It was proposed that these students be assigned to Swansea, 29.5% being Anglo. The resultant student body of Swansea would have been a total of 725 students, 27.9% of which would have been Anglo.[16]

Additional proposed closings include the old buildings at Columbine School, a totally black school. The Board proposed that 225 of Columbine's students be bused to predominantly white schools resulting in a projected enrollment of

12. The School Board's columnar analysis is as follows:

| SCHOOL | PRESENT TOTAL ENROLLMENT | PROJECTED TOTAL ENROLLMENT | PRESENT ANGLO % | PROJECTED ANGLO % |
|---|---|---|---|---|
| Stevens Stedman (to be closed) | 169 278 | 396 0 | 5.9% 69.4% | 48.2% 0 |
| 13. | | | | |
| College View (to be closed) Gust | 343 448 | 0 791 | 64.7% 81.0% | 0 74.0% |
| 14. | | | | |
| Emerson (to be closed) Wyman | 172 273 | 0 445 | 54.1% 27.5% | 0 37.8% |
| 15. Ellsworth (to be closed) Steck | 91 335 | 0 426 | 64.8% 77.6% | 0 74.9% |
| 16. Elyria (to be closed) Swansea | 91 634 | 0 725 | 16.5% 29.5% | 0 27.9% |

524 black students in the remaining new building.

The Board would also close an older section at Mitchell School to be razed and its minority population of 97.1% would remain in the facilities constructed in 1964 and 1974.

Similarly, the older sections of Whittier would be closed. Two hundred and sixty of its students were to be bused to predominantly Anglo schools, leaving 352 minority students with the exception of 1.4% Anglos.

*Enrichment Centers*

The other important aspect of the School Board's plan is the creation of so-called educational enrichment centers, section IV. These undertake special programs in an integrated setting. Students from surroundings areas would be bused to one of the enrichment centers for a period of three weeks for half days each semester. Basically, this would serve as the integrating experience for the students in the concentrated minority and Anglo schools which, as noted above, were not directly affected by the school closing program.

At the junior high and high school levels no effort was made to carry out any desegregation programs. At the same time, Morey Junior High, a centrally located school, would have been closed under the plan and would have served as an enrichment center for the segregated minority schools and the nonintegrated Anglo junior high schools. Again, special programs were to have been offered for three week periods on a half day basis at this enrichment center and transportation was to have been provided by the School District. The Board's plan also goes into some detail in describing the programs which have developed and are now developing in some of the minority schools such as Cole and Manual. Its view is that these also compensate at least in part for the continued segregation in these and other schools.

THE PLAINTIFFS' PLAN

The plaintiffs' program is entitled: "Proposals for District-Wide Desegregation and Quality Education." The several components include desegregation of students, faculty, administration and staff; integration of students, faculty, administration, staff and parents; adequate explanation to and education of the entire community, that is, explaining the reasons for and the purposes of the plan and, similarly, education of teachers and administrative personnel; installation of relevant and necessary curricula to improve the quality of the education; provision of supportive services such as transportation, counseling, nutrition, health and discipline; equalization of facilities and, finally, ongoing monitoring. It states that its crucial aspect is reassignment of students so as to bring about a desegregated unitary system.

Those elementary schools which are presently integrated under the plaintiffs' plan would not be subject to student reassignments. The plan would, in addition, discontinue those desegregation orders which have been heretofore given by this court. In thus starting anew it seeks to bring about reassignments which are equitable, that is, which equalize the burdens of busing between minority and majority students. There would be no reassignments as to the kindergarten children. Voluntary open enrollment would be discontinued. The pairing or clustering of elementary schools in order to carry out desegregation is its most important aspect.

The manner of pairing calls for dividing the grade structure so that grades 1–3 are to be put together in one school and 4–6 in another. Or grades 1 and 2 would be in one pairing and grades 3–6 in another. Alternatively, grades 1–4 would be put in one group and grades 5 and 6 would go into another. Then, all students in one group of grades would go to one school and all students in the other group of higher grades would go to the other school in the pair. In the situation where three or four schools are

clustered the same approach would be followed, whereby particular grades would go to one school or the other. Thus, each school cluster would entertain a limited number of grades. Here again, more than one school might be offering grades 1–3, for example, or grades 4, 5 and 6. Thus, the divisions would be along this line, and according to the plaintiffs' plan this would furnish more flexibility in that it would allow desegregation of a large school by use of schools with a smaller student enrollment.

Actual pairings and clustering are set forth in the plan for 70 elementary schools. Obviously, this requires a great deal of transportation. It is said that the net increase in transported elementary children would amount to an estimated 12,257. At the junior high level the number of children transported would be 7,247, or 9,728 if current hazard transportation is continued. Plaintiffs' plan proposes to desegregate the junior high schools by continuation of the classifications that are contained in connection with the elementary schools. Thus, the paired schools would be assigned to the same junior high school. This would insure, so the plaintiffs contend, a continuity of the same students throughout elementary school and junior high.

### Recruitment

The plan also calls attention to the small number of minority teachers, particularly of Chicanos. For example, there are only 3.3% Chicano teachers in the elementary schools, 4.0% in the junior high schools and 3.5% in the senior high schools. The percentage of black teachers, although somewhat higher, being 10.8% in the elementary schools, 9.9% in the junior high schools and 5.8% in the senior high schools, is also considerably below the ethnic percentages. Plaintiffs' plan recommends that adequate numbers of minority faculty and other personnel be assigned to schools which are to receive minority students under any plan adopted. It also recommends an affirmative program for employing black and Chicano teachers and administrative personnel. It seeks 27% Chicano teachers at the elementary level and an appropriate number at the other levels based on the percentage of Chicano students. It opposes assigning a token minority teacher to a school as being ineffective. It also recommends the hiring of minority aides, including student teachers, parents and teacher assistants to bring the minority representation and school personnel into some kind of balance.

### Inservice Training

The plan also recommends the training of school personnel in such fields as human relations, minority history and culture, administration of discipline, teaching and working in an integrated environment and an ongoing program for all new personnel. Stressed also is the necessity for compelling attendance at such training sessions. The need to obtain financial assistance for these training programs by applying to HEW, Colorado Department of Education, the National Education Association and the Colorado Education Association is stressed. It is recommended also that the District use all community resources capable of helping in the preparation and implementation of the plan including the Chamber of Commerce, the Junior Chamber of Commerce, the League of Women Voters and other similar organizations. Also recommended is the commencement of the orientation program as soon as possible including the scheduling of visits to the schools by the students who are going to be reassigned, so that they may become acquainted with the building as well as the teachers and counselors.

### Bilingual and Multicultural Programs

In addition to their desegregation plan, plaintiffs have endorsed a proposed educational plan for the Denver Public Schools submitted by intervenors Congress of Hispanic Educators. This "Cardenas Plan," which was prepared by Dr. Jose Cardenas, is directed toward dealing with the problems which minority children, and in this instance particular-

ly Chicano children, encounter in today's typical urban American school system.[17] Broadly stated, Dr. Cardenas' educational plan is based upon his contention that modern American schools are oriented primarily toward the education of middle class Anglo children, and that the resulting programs are frequently incompatible with the needs and characteristics of minority children. The plan groups the incompatibilities experienced by minority children into the broad categories of poverty, language, culture, mobility, and perceptions. The thrust of the plan is that the educational system should be altered where necessary to eliminate these incompatibilities, rather than requiring the minority child to reject his own cultural, linguistic, economic and other characteristics in order to adapt to an educational program imposed upon him.

A more detailed analysis of the bilingual approach is appended hereto.

## COMMENTS ON THE PLAINTIFFS' PLAN

As is apparent from the above description, the plaintiffs' plan is what is known as a pairing plan calling for the busing of one-half of the student population in each of two schools or a total of one-half in a group of clustered schools. The difficulty we find in possible adoption of this is, *first,* that it is too tightly structured. It undertakes to govern the child from the time he commences the first grade in elementary school until he has completed high school. Each component is interrelated with the other so that if for any reason one part fails it may well have repercussions on the remainder of the program and it could create chaos. Its complexity would require a resident expert. *Second,* it involves extensive busing and does not distinguish between busing the minority and majority students. Thus, a movement of minority students to a non-integrated Anglo school would oftentimes carry not only minority students but many Anglo students as well. The opposite would also be true. The movement of Anglo students would in many instances carry with it minority students to what had been a minority school. *Third,* the way the plaintiffs propose the plan, there is no room for adjustments because the teacher at the minority school, for example, would be automatically reassigned to the majority school to teach that particular grade. At the receiving school there would be at least two first grade classes, two second grade classes and two third grade classes, so it would be impossible for any students to remain at the neighborhood school. The system would work better in schools which are highly concentrated. The criticisms mentioned would not be significant if there were one percent or two percent of the opposite race transported. In our school system we have some schools of this character, but these are the exceptions. In most schools the concentrations, although often heavy, are less extreme and therefore a large number of Anglos would be bused with minorities. More efficiency would exist as well as less basis for criticism if the transportation system were confined to either minorities or Anglos.

The pairing plan has some obvious advantages. The busing is shared equitably. The plan seeks to systematically avoid busing any person or group for a longer period than necessary. The advantage most often emphasized is that the groups of students will remain together, notwithstanding busing, as they pass through the various grade levels in the same way that they would if there were no desegregation plan. Furthermore, the frustration of transportation may be somewhat reduced from the fact that under the plan the local school no longer serves particular grade levels so that there can be no class at the old school.

17. The Congress of Hispanic Educators has also prepared an addendum to the Cardenas Plan which attempts to make specific recommendations for adapting and implementing the Cardenas Plan in Denver. This addendum has also been submitted to the court.

One obvious advantage which the plan utilizes is the continuing relationship between the paired neighborhood school or home school and the receiving school or schools. This lends itself to some community support essential to any school system.

In the final analysis, however, because of its extensive transportation of students, plaintiffs' program is unacceptable as presented.

## COMMENTS ON THE SCHOOL DISTRICT'S PROPOSED PLAN

The special education programs which are suggested involving the enrichment offerings together with the open school concept and the special programs designed for use in segregated schools are desirable, but the emphasis is on enriched education and can scarcely be considered a plan for desegregation. Thus, the transporting of students from concentrated schools to enrichment centers for three weeks on a half day basis to intermingle with other ethnic groups while engaging in special programs does not pretend to be a desegregation plan. It impresses us, on the contrary, as a plan which is more designed to avoid adoption of a desegregation plan. By closing schools in the center of the city it renders integration a virtual impossibility because it isolates the segregated schools north from the non-integrated schools in the south. For this reason alone, the plan must be rejected.

The numerous school closings which are an integral part of the plan likewise make little contribution to desegregation. Its failure to deal adequately with the problem or to desegregate heavily concentrated schools causes it to fall far short of an acceptable effort designed to satisfy the Supreme Court mandate.

Its recognition of the need for adding minority teachers and for their assignment in all of the schools is desirable. Similarly, its provision for in-service training of teachers and staff, and its enhanced efforts to understand minority students are also praiseworthy. But

little in the way of specific programs for accomplishing these objectives are to be found.

But in the final analysis, the plan must be condemned because of its tendency to further isolate the minority students in concentrated minority schools in the north from the new majority schools which have been concentrated in the new residential areas of the south, the effect of which would be to render integration highly difficult.

## INADEQUACY OF BOTH PLANS

█ Having considered the various aspects of each proposed plan in some detail, we conclude that neither proposal is acceptable in present form. The plaintiffs' plan meets the constitutional standards for desegregating a dual system, but it achieves that goal at the expense of excessive busing. In pairing some of the elementary schools, for example, plaintiffs were inattentive to geographical considerations, thereby causing unnecessarily long bus rides and thus undermining the feasibility of the plan. Plaintiffs' plan is unduly complex and unadaptable to Denver's segregation problem.

█ Defendants' plan is subject to more serious objections:

1. It is, in our view, unconstitutional and equitably defective. A basic inadequacy is found in its definition of a desegregated school as one having an enrollment of 25–75% Anglo. A school, for example, with 25% Anglo and 75% minority population continues to be a recognizable black or Chicano school; hence, the plan would continue the dual system.

2. The educational opportunity in the minority school has been proven in our present trial as well as in previous trials to be inferior to that in the majority schools. To continue segregation increases the likelihood of continuation of inferior educational opportunity for the minorities.

The effort by defendants to achieve a modest level of integration through the

expedient of closing 11 inner city schools and opening four elementary and one junior high enrichment center fails to achieve integration. It may succeed in improving the educational opportunity. This improvement could, however, be accomplished without transportation.

3. The schools sought to be closed are inner city schools which are conceded to be structurally sound and are located in neighborhoods which are desirable to be maintained as family neighborhoods. The closing of the schools would inevitably result in changing the character of areas which are favorably located for achieving integrated neighborhoods and integrated schools. If these closings were allowed to be carried out, families would be discouraged from moving into the central area of the city. The closings tend to waste resources and facilities without providing counterbalancing improvement.

Finally, the enrichment center concept is not here condemned. The administration is encouraged to continue innovative approaches to arts and sciences. However, this should be advanced throughout the system and not as a part of a very limited integration effort. As it is now presented, the enrichment center concept provides for such a limited part of the educational experience that it must be regarded as insubstantial.

It cannot be said that all of the school closings are unjustified. Thus, where it appears that the facilities in question need to be closed for reasons other than desegregation, there appears to be no reason to prevent the closing. This is true of Elyria, part of Whittier, part of Columbine and Mitchell. These latter three proposals would not close the school in its entirety and thus deprive the neighborhood of a school.

In view of the fact then that neither plan promised to fulfill the court's needs, it became apparent at the end of the hearing that a fresh effort was needed. The court gave the parties its own thinking and guidelines and commenced an independent study for the purpose of developing a workable plan or program.

## THE LEGAL AND FACTUAL NECESSITY FOR THE COURT TO FASHION A PLAN

In Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), the problem of an uncooperative Board of Education was present just as it is here. The Supreme Court there pointed out that the school board has the obligation to desegregate a dual school system and to produce a sufficient desegregation plan, and that only after it is apparent that the district will not discharge this duty is it appropriate for the court to take the initiative. With this in mind, we have given the Board every opportunity to discharge its duty but to no avail.

Following the trial which tested the sufficiency of the plaintiffs' and School Board's plans, and following the court's conclusion that both plans were inadequate, an effort was made to have the parties collaborate on implementing suggested guidelines furnished by the court. This, however, failed. The court ordered the professional staff of the School Board to present certain work-ups and in response to these orders there were some submissions, but the court found it impossible to work with the Board in the preparation of a plan much less have the Board do it because of their adamant opposition to any kind of a scheme which called for transportation. Indeed, at the March trial the individual Board members made it clear that they would oppose any plan (including their own) which made provision for busing. Minority members of the Board did not hold this view, but this was of no aid in obtaining production of a valid plan.

The present attitude is not anything new because throughout this litigation the Board has had fairly much the same approach. During this time opposition to busing has been exploited as a political issue and the Board has steadfastly

refused to take any action which might compromise its position in this regard.

But even though it has seemed clear throughout that the Board would continue its refusal to act, we have given them repeated opportunities to carry out their obligation to fulfill requirements of law, but each of these efforts has failed. In these circumstances the court has no option but to take the initiative. *See* Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown* II). In the latter case the Supreme Court said that in default of the School Board's performing acceptably, the court must exercise its equitable powers to provide a plan of its own which will provide constitutional relief. In *Swann, supra,* at 15–16, the Court said:

> If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies . . .

> In seeking to define even in broad and general terms how far this remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults.

The record in this case is replete with evidences to support the conclusion which the court has reached that further efforts to persuade, coerce or otherwise force the School District to develop a plan for desegregation would be unavailing and that, therefore, it has become essential for the court (with the aid of an expert) to seek a just, equitable and feasible plan. Once this became apparent the court requested Dr. John A. Finger, Jr. to proceed with the formulation of a proper plan.[18]

Accordingly, the Board has for the past four years and even in the recent past, notwithstanding the mandate of the Supreme Court of the United States, consistently resisted and opposed every desegregation effort and has sought to avoid the effects of such orders. The court finds, therefore, that the Board of Education has not in the past shown a willingness to formulate a desegregation plan; that it now refuses to do so; and that according to every probability it will continue to avoid and refuse to desegregate the school system. The court finds that further efforts to compel them to do so would be unavailing.

## THE STANDARDS APPLICABLE TO THE ADOPTION OF A DESEGREGATION PLAN

We are cognizant that the primary object of desegregation is to overcome the invidious discrimination found to exist in a dual system and simultaneously to bring about equality of education. In carrying out this objective, the effort must be to adopt reasonable and meaningful measures and to avoid unnecessary impositions and burdens on both minority and majority children.

The Supreme Court has had occasion to consider the adequacy of programs in both *Green, supra,* and *Brown, supra.* In *Green* the keystone of the plan was to allow each student to freely choose the school which he would attend. It was there contended by the School Board that to reject the freedom of choice approach required the Fourteenth Amendment to be construed as demanding compulsory integration. The Court pointed out that *Brown* II held that the inquiry must be whether a particular plan brings about the dismantling of the dual segregated school system.

---

18. We acknowledge the help of the administrative staff in furnishing material work-ups and information on specific demands. However, these efforts fell short of constituting a feasible plan.

It appeared in the record in *Green* that the freedom of choice approach had produced very little, if any, desegregation which was there present. The Supreme Court rejected it. From this it is to be concluded that an important standard in judging any plan is its ability to accomplish the task at hand. It is said that it must provide meaningful assurance of prompt and effective disestablishment of a dual system. The measures to accomplish this must be effective. It seems obvious then that a system which depends wholly on freedom of choice could not effectively change the identity of a school from minority to Anglo or vice versa.[19]

In *Brown* II, *supra,* the Supreme Court emphasized that in fashioning its decrees the court is to be guided by equitable principles, meaning that the decree should be flexible and adjusted to public and private needs—in other words, that full use of traditional attributes of equity power be employed. The Supreme Court said that the trial court may take into account the public interest in the elimination of obstacles to adopting a unitary system. The Court also said that vitality of constitutional principles is not to yield simply because of disagreement with them.

In *Swann* the Supreme Court, through Chief Justice Burger, reviewed the prior cases which had sought to develop guides for desegregation and particularly noted the necessity for doing away with dilatoriness and observed also that the court in *Green* had emphasized the need for a plan which was workable and gave some promise of success. In other words, the plan must promise realistically to work and, secondly, to work now. This expression from *Green* was endorsed once again in *Swann*. A school desegregation case, said the Supreme Court in *Swann*, does not differ fundamentally from other equitable cases in which constitutional rights have been violated. The Court added:

. . . The task is to correct, by a balancing of the individual and collective interests, the condition that offends the Constitution.

402 U.S. at 16, 91 S.Ct. at 1276.

Finally, the Supreme Court in *Swann*, recalled that in *Green* the terms "feasible," "workable," "effective" and "realistic" were proper qualities for testing a plan and determining whether it will work now. For example, the scope and extent of transportation would be tested on these bases; bus transportation as a means of carrying out the desegregation was expressly approved in *Swann*.

Accordingly, then, the basic criterion is that the plan shall be meaningful and therefore effective. It must be a feasible and realistic plan. Furthermore, it must be fair in relationship to the objectives to be achieved and the manner of achieving them.

Specific essential criteria to a viable plan are appended hereto in outline form (Appendix B).

## GUIDES TO FINDING A PLAN

It is often said that desegregation can be brought about without furnishing transportation. In some instances it is true that rezoning of schools does bring about integration. Where this is possible it should be carried out and busing should be resorted to only after other integration methods have failed. Once these rezoning methods have been exhausted, a transportation plan (or plans) is essential to effective desegregation. In our case every rezoning effort has been made. The court has sought a plan which would minimize busing.

It is important to emphasize that the School District presently transports some

19. Such a program has been employed by the School District in the case at bar with some limited measure of success. It is said that some 800 students are enrolled in this program. No one maintains, however, that it operates to change the character of the schools involved. We agree with the Supreme Court's evaluation that it is not an end in itself. At the same time, it is not invalid and may well have some place in a plan which is otherwise designed to desegregate "root and branch."

14,500 pupils. Most of this is because of a lack of school, distance or hazard. The net gain in number of children transported under the plan which is proposed will raise the total to about 20,000 or slightly more, a net gain of an estimated 6,000.

### Assignment of Students Now Being Bused

Many thousands of elementary and junior high school students are being bused at the present time because of long distance, hazardous traffic conditions or lack of a neighborhood school. Where this condition exists and pupils are being transported to a somewhat distant school, rezoning should be carried out so as to assign these students to a neighborhood school where possible. If busing is necessary after the rezoning efforts, the pupils should be transported for the purpose of aiding the desegregation of that school.

Similarly, where minority students are being bused for distance or other reasons, it is believed that they should be bused to an Anglo school and not to a minority school to add to the minority population of that school. The same principle applies to the transfer or assignment of Anglo students to a distant Anglo school along with minority students. This distinction has not been made in instances of mandatory busing by the School District. The tendency has been to pick up and bus groups which are preponderantly Anglo and minority and to do so without separating them. This is to be avoided. Anglo families, for example, who have moved to minority neighborhoods are not to be bused back to Anglo schools in other neighborhoods. Similarly, minority families who have moved to Anglo neighborhoods are not to be required to be bused to minority schools along with Anglo children who are being transported to these schools for the purpose of desegregation. At present, with computer printouts showing the exact composition by grids of minority and Anglo students, there is no longer any justification for transporting groups in an area and doing

so regardless of the ethnic composition of that area. The transfers should operate on a specific basis.

### Voluntary Open Enrollment

The School District has sought to bring about desegregation and integration by use of volunteers. The guideline or standard for this has been whether the individual volunteer seeking transfer and transportation to another school would aid in the integration or desegregation of that school. Thus, the question was whether he was seeking transfer to a school in which he would be a member of a minority group. This program has had some limited success. But there will be a decreasing need for it in a system which is desegregated. The court is reluctant, however, to abolish it at this time inasmuch as it may have some remaining usefulness. But the School District is not to allow it to be used to defeat or avoid the desegregation plan which the court adopts. This would be true in the secondary schools as well. After the program is adopted, some further attention must be given to whether this voluntary desegregation is capable of contributing to the total program.

### Percentage and Numbers Ratios as Guides for Desegregation and Integration

The court is aware that rigid adherence to percentage figures in this regard is not only undesirable but invalid. At the same time, some range of percentages is necessary in order to determine whether a school is segregated or is nonintegrated. Admittedly, the figures which are to be used are guidelines only, and for reasons that are compelling they are and have been disregarded.

For elementary schools the court has considered desirable a 40% minimum percentage of Anglo students, and it has considered the permissible maximum range to extend to 70% Anglo population. In the secondary schools the minimum figure that has been used is somewhat higher, and it has been considered desirable to have 50–60% Anglos in some instances. Here again a cautionary word

should be added, and that is that in some instances it seems desirable to depart from these percentages. Thus, in some of the schools which have a preponderant Chicano population it has seemed to the court more desirable to pursue bilingual and bicultural programs than to change the numbers.

*Home or Neighborhood School Pairing*

The object of this program is to provide the educational values which are present in the desegregated setting while at the same time preserving the advantages of having a home or neighborhood school.

In the plan which has been adopted, permanent assignments from minority to Anglo schools and vice versa have been made in many instances for the purpose of bringing about desegregation and integration. In some other instances pairings between home schools and one or more receiving schools on a less than full-time basis have been employed. This is a daily program in which the minimum time which the student spends in the receiving school is one-half of the school day plus the lunch period. This is more refined than school pairing in that the pairing is by classes. Thus, in the segregated school one-half of the students in a class are transported to an Anglo or majority school and simultaneously one-half of the Anglo or majority students are transported to the minority school. The student spends a major portion of each day at the receiving school, but he commences his school day at the home school and he completes his school day at that school. The part of the day which he spends at the paired school could vary in order to get maximum value from vehicles and in order to avoid congested traffic. For example, the transfer could start immediately after the commencement of the class in the morning or from mid-morning recess to mid-afternoon recess, but in all instances the transported student would spend his lunch period at the paired school rather than the home school. We see the following advantages in this method:

1. It serves to break the isolation which exists in segregated schools and exposes the pupils to an integrated or desegregated school setting during the heart of the school period.

2. It gives the student an identifiable local neighborhood school to maintain as an anchor.

3. The children have a neighborhood school for the purpose of extracurricular activities.

4. The local school is maintained as a social institution (and a playground) within the neighborhood. The parents in both minority and Anglo areas retain a nearby facility and institution in which their children are enrolled with which they have personal contact. This serves as a focal point for the PTA organization and other groups, whereby parents can exert an influence on the school, and the school, in turn, can have community support. It avoids the problems which exist when a child is assigned to a school in a distant area. In this situation the parents find it difficult to relate to the distant school. In the subject program the parents at the home school and at the paired school can exert joint influence in seeing to it that both schools are adequate.

5. The home school pairing arrangement also furnishes a flexible setting in which school officials can institute special programs in the home school to aid the desegregation process or make necessary preparation for the upcoming program in the receiving school. In the home school there could also be compensatory education, bilingual or English language training or similar specialized efforts which promise to be valuable to the home school group.

6. The home school pairing arrangement should ease the logistic burden of school officials. Children are picked up at the neighborhood school and are delivered back to that school. Transportation being from school to school, the bus will not be required to make numerous, time-consuming pick ups. Also, the buses used for home school pairing will

often be available for transporting students who are assigned directly and who need to be transported at the beginning and end of the school day. The home school pairing group will be transported during the day.

The plan adopted has arranged pairings which do not require lengthy bus transportation, and thus it should not be disruptive. Nevertheless, some extension of the school day may be justifiable inasmuch as the busing is not occurring at the end of the day. Hence, in effect, the time on the bus could be made up at one end of the school day or the other.

Should this plan prove impractical or disruptive so as to "significantly impinge on the educational process," *see Swann, supra,* at 30–31, the framework established could always be used for full-time pairing or for an assignment system and nothing will have been lost.

*Reassignment*

In some instances it is necessary to reassign students in order to integrate rather than to pair schools. Even in these instances it is desirable for the students to be picked up at the home school and deposited there also. Where, however, there is no home school children must be gathered in neighborhood areas and returned to those places. We refer to students who are now being bused for distance, lack of school or hazard.

*Support Programs*

Any viable, feasible program which will satisfy the basic purpose of furnishing an equal educational opportunity for all should have a number of attributes:

A. There must be adequate preparation of student body, parents and teachers. Group training programs within the neighborhoods must be carried out so that there can be requisite preparation, whereby problems will be avoided. The School District's proposals set forth in staff studies, Part III, are reasonable and should be implemented to the extent that there is no delay in activating this plan.

B. Where distances are great, transportation should be furnished. The School District's standards of one mile for elementary schools, two miles for junior high schools and three miles for high schools seem generally to be reasonable and are adopted. The School District should continue to provide all collateral services such as hot breakfasts, hot lunches, etc., for children who need them.

C. There must be an affirmative hiring program so as to increase the number of minority teachers in all of the schools. The small number of Chicano teachers is a particular problem and a tangible effort must be made by the District to increase these numbers.

D. To facilitate the teaching programs in the home school pairing program, it is desirable insofar as possible that the transported classes be accompanied by a teacher's aide. This would aid in having a coordinated effort.

## ADOPTION OF FINGER PLAN

During the period from March 4, 1974, the date the first hearings were completed, to March 27, 1974, at which time hearings were resumed, there were numerous conferences and discussions between the lawyers and the court regarding efforts to develop an acceptable plan. These were all unproductive. Finally, a plan was formulated by Dr. John A. Finger, Jr. An alternative was submitted by plaintiffs. The Board of Education submitted proposals and work-ups in response to court orders. Following receipt of these submissions, hearings to consider the feasibility of the Finger plan and to consider the other submissions were held on March 27 and 28, 1974. Dr. Finger testified on direct and cross-examination as to his plan, and counsel for plaintiffs and defendants described and highlighted their offerings. After hearing this evidence the court now concludes that the Finger Plan satisfies the court's guidelines and criteria and should be adopted.

## In General

The plan is comprehensive and thorough. Moreover, it is a result of extensive, painstaking work involving the rezoning from computer grid readouts so as to fully utilize equitably and efficiently the ethnic populations within the several areas. It seeks to limit transportation except where absolutely necessary and to limit the distances to the minimum.

## Use of Rezoning

*First*: *The elementary schools*: It exhausts every possibility for integration through rezoning. This is particularly true in the west side of Denver. As the court has previously noted, the schools in this area are geographically situated so as to permit this approach. Some schools in the other sections have proven susceptible to avoidance of busing by this means.[20]

*Second: Pairing:* A total of approximately 33 schools have been desegregated by classroom or home school pairing (transported to a receiving school for a minimum of one-half time). The schools involved in these pairings are shown below.[21]

The School District staff in one of its work-ups suggested that this half day pairing or classroom pairing provided by Dr. Finger and carried out by dividing the several classes in each school in half and transporting one-half minority students to the Anglo school and one-half of the Anglo students to the minority school might better be implemented by transporting entire grades. As noted above, division of grades allows the groups to be alternated each day or each week. Thus, students would not have to be bused every day or it could be planned so that busing would be required only on alternate weeks. One week one-half of the students would remain in the home school and the next week they would be bused to the paired school. Under the School District's suggestions, grades 1, 3 and 5 of one school could be transported to the paired school and grades 2, 4 and 6 would, at the same time, be transported to the sending school. As a result, one school would be

20. Schools integrated by rezoning include:

| | | |
|---|---|---|
| Schmitt | Cheltenham | |
| Columbian | College View | Rosedale (Main |
| Beach Court | Knapp | attendance area |
| Brown | Newlon | Satellite H) |
| Edison | Westwood | |
| Ashland | Goldrick | Thatcher–McKinley |
| Ashley | Godsman | (Main attendance |
| Philips | Schenck | area Satellite H) |
| Park Hill | Valverde | |
| Barnum | Colfax | |
| Munroe | Cowell | |

The Satellite H schools listed have had transported Satellite H children assigned to them.

21. Schools paired by classrooms include:

| | |
|---|---|
| Mitchell–Force | Traylor, Dennison– |
| Steele–Crofton | Fairview, Greenlee |
| Knight–Barrett | Johnson–Gilpin |
| Asbury–Whittier | Hallett–Cory–Ash Grove |
| University Park–Columbine | Harrington–Wyatt–Ellis |
| Washington Park–Stedman | Smith–Fallis–McMeen |
| Eagleton–Doull | |
| Bryant–Webster–Gust | |

The number to be transported in each instance is one-half of the smallest number of minority students or Anglo students in each pair. The minority students at the Anglo school are not to be bused to the minority school, nor are the Anglo students at the minority school to be bused to the Anglo school.

made up of grades 1, 3 and 5 of both schools and the other of grades 2, 4 and 6 of both schools. The next day there could be a reversal. It is said that one advantage of this would be that the teacher of the class being transported would travel with the group and both first grade teachers, second grade teachers, etc., would be in the same school at the same time and could confer. The court's preference is for the transportation of one-half of each class and the maintenance of six grades in each school.

The same general flexibility could be realized by dividing up the several grades, as we have suggested, and having a full complement of grades at each of the paired schools. So also, the groups could travel on alternate days or alternate weeks, for that matter, so that each child could spend 50% of the pairing period at the home school in an integrated or non-segregated classroom. The School District may, however, wish to try out the grade exchange program and the court would have no objection to this procedure. It should be emphasized that this must not be a before lunch or after lunch program. The integrated setting should last through a minimum of one-half of the school period plus the lunch period as well. There can be no compromises on this.

It is the court's view that in the process of pairing, transportation of minority students to a minority school and Anglo students to an Anglo school is to be avoided. Furthermore, in determining the number to be transported it is to be one-half of the lowest number between the two paired schools. Thus, if Doull has 582 Anglos and were paired with Cheltenham which has 464 minority students, the number transported on any given day would not exceed 232. Thus, 232 minority students would be transported to Doull and 232 Anglos would be transported to Cheltenham. Similarly, with Traylor and Greenlee, Traylor has 514 Anglo students and Greenlee has 438 minority students. Thus, the maximum number to be bused would be one-half of 438 or 219 from each school.

*Third:* The other method in this plan for reducing concentrated populations in minority or Anglo schools is the assignment of students from satellite areas. For the most part, these assignments occur in the northern part of the city and go to the extreme southern part or to schools in the middle zone from the northern part. This, then, tends to be one-way busing. The plan seeks to compensate for the fact that the schools in the southern part of the city do not have to bus out of the area by making provision for junior high students to be bused to schools in the north and northeastern part of the city. Therefore, the balance of the burden of being transported is being carried by the minorities at the elementary school level and by the Anglos at the secondary school level, although it is paired evenly in connection with the paired approach (at the elementary level).

*Fourth:* The *junior high schools* have been desegregated for the most part by rezoning. The very worst problem of concentration and identifiable minority schools is that in Cole Junior High School, which is very nearly 100% black and Chicano; and also in Baker Junior High School, which approaches 100% minority population. Other schools which are almost equally concentrated are Horace Mann Junior High, Morey Junior High and Lake Junior High. Smiley Junior High is a borderline school which is likely to become more minority concentrated.

The plan seeks to bring about junior high desegregation and integration first by rezoning. Extensive boundary changes have been made in some instances, but only minor changes have been made in others. For example, Smiley has not been changed extensively and Hill has not been. On the other hand, in the west part of town, Skinner's boundaries have been changed considerably to aid the condition at neighboring Horace Mann. Similarly, Rishel's boundaries have been modified as have Lake's and Skinner's on the south. It has not been possible to accomplish

desegregation altogether by boundary changes, and so the plan in addition creates satellite zones for assignments out of the Cole area and Mann area, and satellite zones are set up in Kennedy Junior High School and also in Merrill and Place. The end result is "root and branch" desegregation of Cole Junior High and of Baker with the aid of Byers and other schools to the south and west of Baker.

Cole, which had a minority population very close to 100%, would under the plan have its population reduced to a total of 40% black and Chicano and 60% Anglo. Mann, similarly, has been changed so that its minority population is substantially below 50%. Lake also has been reduced so that its numbers and character are drastically changed.

More important than the percentages will be the educational efforts to be made in these schools. The District has an opportunity to change the entire character of these minority schools, whereby its students can be prepared for high school on the same basis that students in other areas of the town have been. Thus, an effort can be made to arrest and amend the deficiencies which have existed and which have prevented fulfillment of educational objectives in these areas.

*Fifth:* The *high schools*: The same kind of transformation is presented at the high school level. The symbolic dual school in the entire system is and has been Manual High School. Not only are its numbers exclusively minority, but it is plain to everyone that it is a black and, to a lesser degree, Chicano school. The staff here has performed remarkably. The effort has been to develop programs within the desires and capabilities of the students and some very fine programs, including the preprofessional programs, have evolved. Those students who wish to pursue a college preparatory program could, of course, do so. In addition, their offerings include such things as airplane construction and house con-

struction. Nevertheless, it was and has been a different or alternative high school, and the effort of this plan is to bring about a metamorphosis, whereby this school will enjoy the same standing and reputation enjoyed by the other fine high schools in the system. The population is changed so that 56% of the students are Anglo. This is largely effected by boundary changes involving East High School and the expansion of the East boundary lines to embrace other areas and the movement southward of other boundary lines. The creation of satellite zones for transportation out and in has also been necessary.

The population of East High School is also set at a figure above 55% Anglo. East High School has long been regarded as an outstanding institution. This tradition has been helpful in maintaining it as a good educational institution. It is believed that Manual could profit by being associated on a campus basis with East High, whereby teachers could be exchanged and the students could take some of their courses at one or the other school. Each school should, of course, have its own administrative staff, but there must be also an overall supervisor of the two schools plus a supervisory staff capable of determining the course offerings and transportation needs as well as coordination of the two schools. This would furnish an opportunity to create a joint educational effort unmatched in this city and in this part of the country—an institution with the very highest educational standards. Manual's progress in developing premedic, pre-law and pre-engineering ought to be continued and encouraged. No doubt there are other special areas in which it is able to contribute to special objectives. East also could have non-duplicative courses which would attract students who are assigned to Manual. It should be noted that these schools lend themselves to this kind of a program because of their geographic proximity. The distance which separates them is approximately one and one-

half miles. It is therefore ordered that East and Manual be consolidated as an East-Manual complex.

### Adoption of the Bilingual-Bicultural Plan of Dr. Cardenas

In view of the very large population of Mexican-Americans or Chicanos in the Denver school system, the Cardenas or bilingual-bicultural approach to the education of this minority group is a very sensible method and to the extent that it can be useful to building bridges between the Spanish and Anglo cultures, it is to be fully utilized. At present some initial effort is being made at the Del Pueblo Elementary School along this line and undoubtedly a good deal has been learned from this pilot or model program. It is the view of the court that this system of teaching should be installed in Baker Junior High School and West High School, both of which have large Chicano populations. It seems desirable also that it be installed in the Swansea School.

Some representatives of the Mexican-American community in this case have expressed a desire not to desegregate the Del Pueblo School during the period that the program is developing. The court can see advantages in this and therefore holds that desegregation is not in its best interests. The Swansea School does not offer any serious segregation problem since it now has approximately 35% Anglo population and thus reassignments are not necessary here either and, again, the bilingual program should be installed at this school. The exact mechanics for implementing this program are not clear and, therefore, the School Dictrict must employ consultants to aid this process.

It is recognized that most of our Spanish surnamed or Mexican-American children are able to speak English and thus teaching in the Spanish language would not be necessary. Nevertheless, the Spanish language is a more natural one for a great many Spanish surnamed or Mexican-American students. Thus, extensive curriculum offerings in the Spanish language and in Spanish culture would be appropriate in the mentioned schools.

As noted, further comments and an analysis of the Cardenas plan is appended to this opinion, and the Cardenas plan itself is in the record in this case.

### Comments on Written Objections to Finger Plan

We have reviewed the objections raised by the School District to the proposal of Dr. Finger and in some instances have made corrections to comply with their requests. On the other hand, the objections which they make which go to the method and philosophy of the desegregation and integration plan must, of course, be rejected. For example, they object to our rezoning numerous elementary schools, some of which satisfy the integration guidelines. This, however, is to bring about integration of neighboring schools and is done in this manner so as to avoid busing, to which the School District is also vigorously opposed. Therefore, the assertions that needless rezoning has taken place are not valid.

As to the junior high schools and high schools, it is quite true that Manual is the only seriously segregated high school. Adjustments have, however, been necessary in the case of the other schools in order to bring about the desegregation of Manual and in order to reduce the minority population of East High School as well.

It is said that the population of West High School has been reduced substantially. The Finger Plan accepted the figures that were presented in the School District's computer printouts. It is true that a segment of the attendance zone has been reassigned and that this was a largely minority area, but an equal number or even an increased number, according to the printout, has been newly assigned to West High. It is predicted that when the actual attendance is counted, West will have the same number of students that it had

before, perhaps a few more, and will have an Anglo percentage that is or is close to being within the court's guidelines.

The objections about the closing of schools are in respect to the Alcott-Smedley pairing and the mention of a new school. This can be adjusted in 1975 when the new school is opened. As to the Carson Elementary School, Dr. Finger was entirely cognizant of its limited capacity. The presence of its special programs was fully considered and it is capable physically of entertaining the additions.

If, as the School District contends, there is an over-capacity in some of the junior high schools, boundary adjustments can be made so long as they do not interfere with the ethnic percentages which have been achieved. It is anticipated that a number of adjustments will have to be made; that it is impossible to discover every problem.

While the court appreciates the School Board's objections and recognizes that Dr. Finger could have done better, it must be pointed out that the District which is vociferously complaining did not utilize its opportunities to make positive offerings and, therefore, their objections have to be treated in this light. For example, they now, at this late hour, April 4, 1974, say that they would prefer *their* paring program to the one that the court has indicated a preference for. Needless to say, it would desegregate only the fourth, fifth and sixth grades of elementary schools. Apart then from its weak and late endorsement, it is unacceptable.

We have considered the plaintiffs' objections which are predicted on effectiveness, workability, fairness and legality, and we do not see any necessity to comment on these beyond saying that it is a very thorough columnar analysis which in substance declares that the plaintiffs' or the Stolee plan would be better. It is true that in some respects the Stolee plan might better satisfy the mentioned criteria. In other respects,

neither the original nor alternative Stolee plans are as conceptually sound as the Finger Plan. We see no basic difference in the principle between the Stolee plan and the Finger Plan. The difference is in the Finger Plan's more efficient avoidance of transportation and more efficient utilization of transportation and the Finger Plan's concentration on the more serious problems. Overall, the Finger Plan appears to the court to be more equitable and equally effective, workable and legal.

As to plaintiffs' criticism of the classroom pairing part of the Finger Plan: True, community acceptance is not to override considerations of constitutionality and validity, and in commenting on the instant pairing system this has been made entirely clear. There is a more basic principle involved. There is much value to be derived from the home school as we have pointed out and no great virtue *per se* in abandoning it since it does provide more family support in the program and, therefore, has some social value. Whereas fulltime pairing furnishes more time in the integrated atmosphere which is also valuable, there is no great virtue in relinquishing family control of the child in favor of control by the school authorities. Denver people, minority and Anglo, are devoted to the neighborhood school and the values which are to be derived from it. This fact would not justify adoption of an unworkable plan, however, or an illegal plan, but we do not perceive constitutional or legal objections to the plan. The question is then will it work as well as full-time pairing. There is every reason to believe that it will.

The intervenors', Congress of Hispanic Educators', objections have been considered and, for the most part, their problems have all been corrected.

The foregoing is not a detailed exposition of the Finger Plan. An accompanying decree will contain its specifics including reference maps. The narrative herein modifies the plan somewhat, but it is substantially the same. The

plan, as modified, is adopted and its formal adoption will be set forth in a separate decree. The court finds that the plan is feasible, reasonable and equitable in that it seeks to bring about the necessary changes with a minimum of disruption and difficulty. The busing distances are not great. The accompanying maps demonstrate that a distance of eight or nine miles is comparatively lengthy and that most of the distances are three, four or five miles. Also, the plan seeks to prevent unnecessary and disproportionate transportation. The other methods employed have been selected with a view to consideration of the problems of the children involved and with a view to sparing the imposition of burden on them as much as possible.

The kindergartners are not included in any assignments. The elementary grades are related to their home schools and are very carefully controlled and returned to home schools in most instances rather than to neighborhoods. The plan is equitable in that it seeks to prevent disproportionate transportation burdens.

The plan shows promise of success provided there is a positive effort on behalf of interested members of the community.

Any plan is, of course, imperfect. It can be said for the present plan that the utmost care was exercised in its adoption, and it can be said also that, considering the scope, magnitude and extent of the problem presented, it appears to be and the court so finds that it is well balanced, most equitable and most feasible.

It is concluded, therefore, that the plan is to be adopted as modified and it is directed that the parties submit a formal decree incorporating the plan's narrative portions and directing its adoption and imposing the requisite injunctive provisions. The formal entry of judgment will await the presentation of the mentioned decree.

## APPENDIX A

## ANALYSIS OF THE "CARDENAS PLAN" SUBMITTED FOR THE COURT'S CONSIDERATION BY INTERVENORS, CONGRESS OF HISPANIC EDUCATORS

The Congress of Hispanic Educators, one of the intervenors in this action, has submitted for the court's consideration an education plan for the Denver Public Schools prepared by Dr. Jose Cardenas, as well as an addendum to that plan which attempts to adapt the plan to the specific conditions in the Denver schools. Dr. Cardenas' educational plan is directed toward dealing with the problems which minority children encounter when they are introduced to a school system which, Dr. Cardenas asserts, is oriented more to educating the middle class Anglo youngster than the poor minority child.

While many of the elements of Dr. Cardenas' plan are equally applicable to the problems of all minority groups, the plan is particularly directed toward the educational problems of Mexican-American children, who comprise an appreciable segment of the pupils in the Denver school system. Briefly stated, Dr. Cardenas recommends adjustments in the Denver educational system over a wide range of areas which he feels will make that system more compatible to the minority child's economic circumstances, his cultural and language orientation, his high degree of mobility, and his perceptions of himself and the world around him. Dr. Cardenas' plan is at heart based on the conviction that minority youngsters often fail or perform poorly in the typical American school system today, because the school the child attends, whether integrated or segregated, is largely an alien world to him, where classes, including the most basic of skills, are taught in a language which the child often does not comprehend or lacks facility in, where he is asked to relate to experiences which have no relevance to him outside the school, and where he is often taught to regard negatively his own

background, culture and personal abilities.

The basic goal behind the constitutional requirement of desegregation of the public schools is to end the social isolation of minority children which hinders or prevents them from entering the mainstream of American society. As was stated in *Brown* I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954):

> To separate them from others of similar age and qualifications solely because of their race generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone.

347 U.S. at 494.

The Court at the same time emphasized the critical importance which an adequate, meaningful, equal education plays in insuring the minority child a place in American society:

> Today, education is . . . a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

347 U.S. at 493.

It seems apparent that a school system should strive to make the "opportunity" of an education something that *all* children in that system can avail themselves of. Otherwise much of the value and purpose of requiring the dismantling of illegal dual systems is dissipated. It seems particularly important at the present time that the Denver educational system be responsive to the educational needs of minority black and Chicano students as well as those of the majority Anglos.[1]

One educational element called for by the proposed Cardenas plan is the utilization of bilingual training, particularly in the low elementary grades. Currently *many* elementary school Chicano children are expected not only to learn a language with which they are unfamiliar, but also to acquire normal basic learning skills which are taught through the medium of that unfamiliar language. Some provisions for effecting a transition of Spanish-speaking children to the English language will clearly be a necessary adjunct to this court's desegregation plan.[2] Furthermore, this court is mindful that meaningful desegregation must be accompanied by some appropriate alterations of existing educational programs in order to adequately deal with new problems which will arise in the operation of desegregated rather than segregated schools.

The type of educational program proposed by Dr. Cardenas is particularly appropriate for the Denver school sys-

---

1. According to figures compiled by the School District at the commencement of the 1973 school year, black and Chicano students constituted 17.6% and 27.0% respectively of the total elementary school enrollment in the District. The minority percentage was slightly lower in the junior high and high schools.

2. *See* Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). After integrating its school system in 1971 as a result of federal court order, the city of San Francisco had over 2,800 students of Chinese ancestry in the school system who were non-English speakers. Supplemental English courses were given to only abut 1,000 of these students. Emphasizing that California law placed prime importance upon use of English in the school system, although permitting bilingual education under certain circumstances, the Court found the situation as it existed in San Francisco to be violative of § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. That section bans discrimination based "on the ground of race, color, or national origin," in "any program or activity receiving Federal financial assistance." (San Francisco's schools were receiving large amounts of federal assistance.) The Court expressly declined to reach the issue of whether the condition also constituted a violation of the Equal Protection Clause of the Fourteenth Amendment.

tem because of the city's and region's long tradition of Mexican and Chicano influences. Additionally, Colorado law specifically encourages the use of bilingual and multicultural programs such as those proposed by the Cardenas plan to effect an enriching and non-disruptive transition of minority children from their dominant language to the effective use of English.[3]

Most of the opposition to the Cardenas plan generated during the evidentiary hearings went to the practicality of the plan and to problems of its implementation rather than to the educational principles espoused. Clearly the plan in the scope proposed could not be fully implemented throughout the district immediately. The plan would require coordination by the School District with other city and state agencies, hiring of new faculty and administrative personnel or additional training of current personnel, and experimentation to determine which specific aspects of the plan are best suited to Denver's situation. Nevertheless, the court feels that a prompt start should be made in a pilot program for implementation and utilization of the Cardenas plan, or something similar to it, in Denver. The court proposes the use of the Del Pueblo Elementary School as a voluntary open school for implementation of the plan during the 1974–75 school year, with similar programs to be developed on a pilot basis at Baker Junior High and West High, as they are constituted under the court's final desegregation plan. Similarly, Garden Place and Swansea Elementary Schools appear to the court to be proper subjects for the pilot program.

## APPENDIX B

### OUTLINE

#### CHARACTERISTICS ESSENTIAL TO A VIABLE PLAN

I. Constitutionality

 A. Must desegregate and must do so now.

 B. Plan must be equitable.

 1. Both Anglos and minorities must assume their fair share of the burden. Plan is not to be too onerous on any one ethnic group.

II. Feasibility

 A. Plan must be workable but this is not to be tested by universal acceptance.

 B. Simplicity

 1. Avoid unnecessary disruption of the beneficial non-segregative aspects of the present educational system.

---

3. 1963 CRS 123–21–3. *Policy of state to instruct in English*—exceptions—Instruction in the common branches of study in the public schools of this state shall be conducted principally through the medium of the English language; except that it shall be the policy of the state also to encourage the school districts of the state to develop bilingual skills and to assist pupils whose experience is largely in a language other than English to make an effective transition to English, with the least possible interference in other learning activities.

 123–21–4. *Teaching of history, culture, and civil government*—(1) The history and civil government of the state of Colorado shall be taught in all the public schools of this state.

 (2) In addition, the history and civil government of the United States, including the history, culture, and contributions of minorities, including, but not limited to, the Spanish Americans and the American Negroes, shall be taught in all the public schools of the state.

C. Continuity
 1. Develop an overall desegregation program that will provide a measure of continuity between a child's elementary, junior high school and high school education.
D. Minimize busing by utilizing the relocation of attendance zones.
 1. Employ walk-in integration wherever possible.
 2. Wherever possible, bus children who are already being bused because they have no schools in their own neighborhoods.
E. Where long-distance busing *is* unavoidable.
 1. Avoid rush-hour traffic by pairing schools and sending children back to their neighborhood schools before the end of the school day.
 2. Where schools are participating in long-distance busing, allow parents to attend PTA meetings at their neighborhood school if transportation is a problem.

III. Providing Equal Educational Opportunity for All
 A. Allow bilingual approach to learning for Spanish speaking children.
 B. Provide multicultural educational approach for all ethnic groups.
 C. Provide collateral services (hot breakfasts, hot lunches, etc.) for children in need of them.
 D. Pursue affirmative action program in hiring minority teachers, striving for an integrated faculty in all schools.
 E. Maintain high quality of education, making curricular adjustments to meet the needs of an integrated student body.
 F. Where pairing is employed:
 1. Allow children to attend their neighborhood schools at end of day to receive special or individualized training (*i. e.* reading in Spanish, special help for slow readers, etc.).
 2. Provide carefully designed programs in neighborhood schools at end of day to encourage insight and understanding by discussing the benefits and problems of living and working together in an integrated environment.

IV. Execution of the Plan
 A. Program for educating staff, parents and students as to the problems which they must anticipate and deal with. See plan of school administration, Defendant's Exhibit ZB–III.
 B. Appoint a Monitoring Commission composed of outstanding members of the community. Duty will be to observe the execution and report to the court.

# PREPARATION FOR INTEGRATION STAFF, PARENTS, STUDENTS

It is imperative that administration and staff have time (minimum of 3 months) to carry out programs in all schools to insure that the process of integration has the optimum opportunity for success. With careful preparation and time for discussion, friction, conflict, and violent eruption will be avoided. With time to plan and implement a variety of activities, school climate can be enhanced so that a learning situation is created which will be responsive to children's needs and interests. Other desegregation processes have included a rigorous campaign of preparation of teachers, students, and parents over a period of time spanning a number of months.

In the process of changing schools, children are subjected to many physical, emotional, and psychological stresses. The time allotted for preparation of pupils, faculty, and parents will bear a direct relationship to the time needed for making the transition effective for each child involved. It has been demonstrated that the only way that integration can work is through the understanding and total cooperation of all persons and communities involved.

Students involved in school changes as a result of integration are likely to be facing adjustments beyond any they have previously experienced; consequently, the need for careful planning for school adjustment will likely be compounded for most children.

The planning for integration should be developed in three distinct phases:

1. Pre-integration activities
2. Transition period activities
3. Sustained or continuing activities

I. Pre-integration activities

A. Total staff of Denver Public Schools

1. Complete explanation of total plan via Channel 6 during school day.

| | Tentative Time Line | Resources |
|---|---|---|
| | April 1 | A special task force will be appointed by the Superintendent to assist with planning the integration activities necessary for an effective build-up toward implementation and to assist with procurement and scheduling of human and material resources needed. |
| | April 3 | Superintendent and Staff |

| | Tentative Time Line | Resources |
|---|---|---|
| 2. Central office staff will have a point of contact designated so that school administrators will have an immediate response to questions or referral to appropriate information or resources. In addition, central office staff will have thorough orientation to the total plan. Mandatory workshops to assess and deal with attitudes, more effective communications, and assistance to principals and school staffs will be implemented. | April 1 | The Office of Community Specialists and the Office of School Community Relations will become a point of contact and a clearing house for information and referrals. The Special Task Force will be allocated to assist.<br><br>Assistant Superintendents will orient and then meet with total staffs and individuals to plan for optimum implementation. |

**B. Principals**

In-service workshops for all elementary administrators are scheduled to begin in April and continue for a six-week period. Workshops will deal with communications, educational innovation, and program implementation and interpersonal relationships.

| | Tentative Time Line | Resources |
|---|---|---|
| | April 1, 2 | |
| | April 2, 3, 4, 5 | |
| (workshops) | April 1 | Department of Elementary Education and Community Specialists<br><br>Colorado University |
| 1. Presentation of details related to a principal's school will follow orientation to the total plan. | April 4, 5 | Departments of Elementary and Secondary Education<br><br>Pupil Services<br>Research Services |
| 2. A plan for communication with central office and other principals will be implemented. | | |
| 3. The principal's role will be explored through mandatory workshops with emphasis on:<br>(a) Attitude assessment and follow-up programs for improving attitudes<br>(b) Understanding of "change agent" role<br>○ Staff<br>○ Community<br>○ Students | April 8, 9, 15 | Departments of Elementary and Secondary Education<br><br>Community Specialists<br>{ Materials and procedures developed for the Stedman-Hallett and other integration implementation will be used. } |

| | Tentative Time Line | Resources |
|---|---|---|
| 4. The need for the principal's personal contact will be stressed.<br>(a) Staff<br>(b) Pupils<br>(c) Community and parents | | |
| 5. Principals will mobilize resources for:<br>(a) Information center in each school<br>(b) Communication<br>(c) Group interaction | April 8, 9<br><br>(Spring Intermission April 10, 11, 12) | Each Principal will reduce the details of the plan which pertain to his school to simplest terms and set up an information center so that staff, community and students may have ready access to accurate information. |
| (d) Orientation programs for staff, students, parents | April 15, 16, 17, 18 | Principals will schedule meetings involving staff, parents, students, to provide for idea exchange related to implementation of integration and to orient all concerned regarding plans for implementation. |
| C. Staff (includes all employee categories at each school and all supportive personnel) | | |
| 1. Explain implications of plan for each job and person | April 8, 9, 15 | All employee categories (aides, custodians, clerical, lunchroom, bus drivers, teachers) will be required to have personal contact with the Principal to discuss how the plan may affect each job and person. |
| 2. Attitude assessment and follow-up programs for improving attitudes | April 17, 18, 19 | Principals and Department Heads will assess through required group and individual discussions, attitudes and define areas of need and communicate with Community Specialists regarding implementation of strategies for improvement. |
| D. Teachers | | |
| 1. Provision will be made for teacher-teacher idea exchange between sending and receiving schools | April 22–26 and May 13–17 | Principals of paired or involved schools will schedule required joint faculty, grade level, or subject area meetings for the purposes of idea exchange, coordination of instruction programs, instructional material |

| | Tentative Time Line | Resources |
|---|---|---|
| 2. Intensive workshops<br> ○ Student-student relations<br> ○ Student-teacher relations<br> ○ Teaching strategies<br> ○ Intra-staff relations<br> ○ Plans for parent involvement<br> ○ Teacher-parent relations | May 20–31 | needs and special student identification and needs. Some interschool visitation may be provided during the regular school day with substitute teachers provided.<br><br>The Division of Education will plan and schedule mandatory workshops for teachers to be involved with the changing human relationships of the integration plan, the necessary exploration of teaching strategies, and the planning necessary for parent involvement and communication.<br><br>Elementary Education Pupil Services<br>Secondary Education Community Specialists<br>Curriculum Development Federal Projects |
| ○ Preparation for staff integration (transfer of teachers) | April 8, 9, 15, 16 | Personnel Services in cooperation with Elementary and Secondary Education will assist principals with identification of staff balance parameters and with the designation of teachers who need to be transferred. All principals and teachers will be provided with written information related to the procedures to be followed in making necessary transfers. Teachers to be transferred will be identified and informed no later than April 12. Teachers to be transferred will be given an opportunity for visiting their new school of assignment for conferences with the principal and orientation to the assignment. |
| E. Students<br>1. Inter-school visitation<br>2. "Buddy" system<br>3. Students will be involved in activity planning | May 20–31 | Principals with the assistance of the Department of Pupil Services will schedule students for visits to their new school for orientation to the school and programs. A student "buddy" system will be implemented so that transferred students will have a "buddy" to further assist with orientation and help broaden acquaintances.<br><br>Transportation |

| | Tentative Time Line | Resources |
|---|---|---|
| 4. Inter-school small group student activities | May 20-31 | Principals of involved schools in cooperation with Pupil Services will be expected to plan and implement a schedule of small group meetings for students. |
| 5. Workshops for students will be held to: <br> ○ Identify and develop student leadership <br> ○ Explore student-student relationships <br> ○ Develop understanding of the issues and the process of dealing with them <br> ○ Developing interest and support for integration | | Guidance Services <br> Psychological Services <br> Social Work Services <br> Student Activities |
| 6. Orientation programs will be carried out in each school | August 26-30 | Principal and Staff will develop and implement programs to acquaint new pupils with new and unfamiliar buildings; meet teachers and pupils services staff; other pupils assist in the assigning of lockers, etc.; orientation of new pupils to procedures and discipline of that school; also see (E-1) [*supra*]. |
| F. Parents | | |
| 1. Parents will be given orientation to the plan for integration | April 8, 9, 15, 16 | A rebroadcast of (A-1) will be scheduled during the week of April 8-12 for evening viewing by the community. Appropriate notice will be provided through each school and media releases. A special report will be provided to all homes in the District. <br> Channel 6 |
| 2. Inter-school visitation will be provided | | Press Relations and Public Information |
| 3. Provision will be made for parents to explore parent-school relations and needed communication | | |
| 4. Parents will be involved in planning for implementation of student transfers | May 13-17 | Principals will invite parents to receiving schools for orientation and to establish communication. School district transportation will be provided, to the extent possible. |

| | Tentative Time Line | Resources |
|---|---|---|
| 5. Parent-parent meetings will be held between sending and receiving schools<br>6. Provision will be made for parent-staff activities and planning | May 20–31 | Principals will be expected to provide for small group parent meetings for the purpose of establishing planning committees made up of staff and parents. |
| II. Transition period activities<br>A. Develop ad-hoc committees in each school to:<br>○ Assist with communication<br>○ Deal with rumors<br>○ Develop plans for crisis situations<br>○ Meet with media, prepare releases<br>○ Identify and solve problems | August 1–9 | Principal and Staff with <u>Special Task Force</u> assistance. |
| B. A staff contact will be identified in each school so that problems are recognized and needs met. | August 1 | <u>Principal</u> |
| C. Mandatory workshops from pre-integration activities will be continued to re-define immediate problems, ideas, solutions | Sept. 1–Jan. 1 | <u>Departments of Elementary and Secondary Education</u> |
| D. Extra-curricular activities will be planned and implemented to provide for broadest participation. | August 1, 2, 5, 6, 7 and thereafter | Office of Athletics, Recreation, and Safety Student Activities Supervisor and <u>Transportation Department</u> |
| III. Sustained or continuing activities<br>A. Provision will be made for regular mandatory orientation programs for new employees | August 1 and thereafter | <u>Division of Education and Department of Personnel Services</u><br><u>Community Specialists</u> |
| B. Continuous staff development activities will be carried out related to:<br>1. New teaching strategies and materials<br>2. Student-teacher relations<br>3. School-parent relations<br>4. Identified needs and problems | August 1 and thereafter | Through <u>Division of Education</u> there are existing structures to carry out these functions.<br><u>Curriculum Development</u> |

| | Tentative Time Line | Resources |
|---|---|---|
| C. Provision will be made for continuous assessment of instructional program effectiveness, and restructuring of content, methods, and materials | Presently scheduled and continuing | The regular assessment programs will be continued. Testing and Pupil Records Research |
| D. Parent activities will be planned on a regular basis designed to foster pride and understanding, seek solutions to problems and thus strengthen parent-school relationships | August 1 and thereafter | Continued use of committees formed in pre-integration activities |
| E. Committees will be formed in each school made up of staff, students, and parents to continue to direct the efforts of the school toward successful quality integrated education, i.e. continuous, on the spot professional growth | August 1 and thereafter | Principal |
| F. Provision will be made for continuous development of activities designed to assist students to:<br>1. Maintain or improve relationships with peers and staff<br>2. Develop leadership<br>3. Identify problems and seek assistance<br>4. Develop pride in self and school | August and September thereafter | Principals and Community Specialists Guidance Services Psychological Services Social Work Services Student Activities |

April 5, 1974

Honorable William E. Doyle
Judge, U. S. Court of Appeals
Denver, Colorado

Dear Judge Doyle:

I hereby submit to you my recommendations for the desegregation of the Denver Schools. I believe that the procedures proposed are feasible, workable and educationally sound. You should anticipate that there will be considerable opposition from the citizens of Denver, but I know of no way to implement your responsibilities without such opposition. It is lamentable that no one speaks of the important outcomes to be achieved through the integration of schools, although I think most citizens really believe in the American ideal of equality and equal opportunity, it is understandable that that ideal gets in conflict with the desire to provide for one's children and one's own self fulfillment through one's children. I don't think most people want to condemn some children to poverty or an unfulfilled life, but few people want to pay a price at the expense of their children to bring this about.

Despite the widespread opposition to busing, there is no evidence that it hurts anybody. The facts are that many children enjoy it. Others view it as just a thing one does like driving to work in one's car. One just does it. Some children don't like it, but that usually is because the bus is unsupervised and the children are teased or assaulted.

Everyone knows that without effective planning and sometimes with it, there will be problems of confrontations among students. Difficult as these are to deal with, students do eventually seek and find accommodation. I wish that the citizens of Denver would know and believe that the bringing of people together is better than the alternatives of keeping them apart. The research does seem clear on one point, and that is that Anglo students attending school with minority students do just as well as their compatriots in predominately Anglo schools. I think that you have thought of something quite unique in your classroom pairing idea. Hopefully you will find support among the leaders of the community in bringing this idea to the fruition of better education. Thank you for inviting me to be your consultant.

Sincerely,

(s) John A. Finger, Jr.
John A. Finger, Jr.

JAF/lg

---

Introduction.

In this Denver plan four different procedures have been followed in integrating the schools in the District. All the schools have been rezoned using a gridded map showing the number of students residing in a grid. As many attendance districts as possible have been defined that will provide integrated residential attendance districts. Secondly, some schools have been integrated by short busing of minority students. Distances involved are mostly less than 3 miles and 10 to 15 minutes duration. Students involved in short busing are reassigned to schools for six elementary years. One group of 1100 minority students are reassigned to schools in the

southern part of Denver for their six elementary years. These students are assigned to junior and senior high schools to which they can easily walk. The schools which receive these minority students are receiving schools only at the elementary level. They are bused to minority schools at either the junior high school or high school level. Finally, some 12,000 students are involved in a classroom pairing plan in which a classroom in a minority school is paired with a classroom in an Anglo school.

Rezoning of Schools.

The Denver School Department has developed a computerized system for pupil accounting. The center of each block in the city has coordinates and the pupils residing on the periphery of the block are linked to the coordinates. The base data for rezoning has been pupils residing within approximately 3,000 foot squares (grids), but a grid is actually composed of an aggregate of city blocks. The system can provide block by block data if it is needed for fine adjustments of attendance zones.

Schools Integrated by Rezoning.

Nearly 10,000 students will attend integrated schools that are essentially walk-in integrated schools. Six hundred thirty students will have short bus runs within attendance zones because they live more than one mile from their school assignment. The court directive that schools be within the limits of 40% to 70% Anglo is essentially met in these schools, although one school is 39.5% Anglo.

Schools Integrated by Short Busing.

Eleven schools have been integrated with short busing. These schools will enroll 4,300 pupils. Approximately 1,500 minority students and 400 Anglo students will be bused to these schools. Many of the minority students involved in short busing are already being bused under previous court orders. The School Department should revise these school assignments so that the schools involved in receiving short bused students receive the same students they now receive, in addition presumably to some new students.

Schools Integrated by Receiving Minority Students who will Attend Junior and Senior High Schools in their Home District.

Approximately 1,100 minority students will be bused to schools in the southern parts of Denver. These students will bear a heavy burden in bringing about integration in Denver. Special provisions should be made for these children so that their school assignments will be effective.

First, extra buses should be provided to pick up stragglers who miss the regular bus runs.

Second, provision should be made to take care of children who become ill or who must be returned home. Transportation should be provided at school expense either for parents or children between school and home for emergency use.

Third, parents should be provided with transportation at school expense for PTA meetings or other school sponsored activities involving parents.

Schools Integrated by Classroom Pairing.

The pairing of schools has been developed in a unique way for Denver because of the court's desire to implement a suggestion first put forward by Art Branscombe, educational writer for *The Denver Post*. Under this suggestion, some schools are paired classroom by classroom. The students will spend a minimum of half of their time in their paired schools, at least through the lunch hour. The pairs developed in this plan are such that either of the following procedures could be followed.

A. Students in a *classroom* are paired with a classroom in another school, one classroom predominantly Anglo, the other predominantly minority. These two classrooms exist as a unit.

Each classroom could be divided in half and half reassigned to the other school for the entire year. Or, the students in each classroom could make their own provisions for how students would be exchanged between schools. The same students might not necessarily go each day. The mechanics of the exchange or pairing would be that one-half of the children in a classroom arrive at their home school, or at convenient bus pick up points, at the beginning of their school day for busing to their paired school. Sometime after lunch these children are returned to their home school where they engage in appropriate educational activities. Buses exchanging pupils would leave the paired schools at the same time. During the interval when only half a class is present teachers would be able to continue teaching the smaller group. If the time at which students are returned to their home school is staggered and rotated, one bus should be able to make two runs or perhaps three and then be available for close of school bus runs. I think part-time pairing is an idea worth trying. If it is too cumbersome or unworkable, permanent reassignments can be made between the same paired schools.

B. The School Department has submitted to the court a procedure for pairing schools for grades 4, 5 and 6, which may be the most effective procedure for pairing classrooms. Entire classrooms would be bused between two schools. For example, the sixth grade in a minority school would be bused to an Anglo school on even numbered days of the month and vice versa on odd numbered days. Either a fifth grade or a different sixth grade would be traveling in the opposite direction. Classrooms would of course be integrated upon arrival at their paired classroom destination. Moving entire classrooms has many advantages. First, the children can be accompanied on the bus by their teacher. Secondly, the two teachers, one from the minority school, one from the Anglo school, will be together so that programs, activities and integrative experiences can be planned and discussed. Thirdly, the two teachers, usually one experienced with teaching Anglo children and one experienced with teaching minority children can help each other in developing rapport with children. One disadvantage is that the number of children bused would be somewhat increased since minority children in an Anglo school would also be bused and vice versa, but the number of such children is small. Furthermore, the number of buses needed would only be increased if, by including the minority group on a bus run between schools, an additional bus would be required. In some instances two sixth grades or two first grades one day might occupy the classrooms of two fifth grades or two second grades on another day, but in larger schools that would usually not be necessary. A few of the schools have excess capacity so that some rooms would be unoccupied when a classroom went to the paired school. This arrangement may be especially effective where open schools exist. Further, the School Department has indicated its desire to develop enrichment centers. Special equipment and facilities can be placed in one school and serve both paired schools, or some kinds put in one school and different facilities in another. Staggered hours could allow buses to make more than one run between paired schools. When whole classrooms are exchanged there would be more flexibility as to when buses leave from paired schools to exchange classrooms.

In almost all cases children attending paired schools can walk to school. Ash Grove involves some busing inside the attendance zones. The time involved in busing between paired schools is probably not over twenty minutes.

In most of the schools paired by classrooms there are very few Anglos in minority schools and few minorities in Anglo schools. There are a few exceptions, for example, Lincoln and Eagleton. In these schools it might be more desirable to use method A for pairing which involves only half a class. At

least that would reduce the amount of busing because only the minorities would need to be bused. I believe that busing whole classrooms is better and the amount of extra busing involved is insignificant.

## ADDITIONAL RECOMMENDATIONS.
### Zone Changes.

It may be desirable to adjust some school district attendance zone lines to conform to existing boundaries. The School Board has the authority to assign students to school and must exercise that responsibility. The Court should allow it to make adjustments in student assignments consistent with the overall procedures of the Court's requirements.

In some instances it is obvious that a boundary change would not alter the overall assignment procedure. An example of this would be the boundary between Moore and Bromwell. If the School Department wishes to move such grid zone lines to existing zone lines, either to adjust school enrollments or for the convenience of students, I recommend that they be authorized to do so.

Some zone lines determine whether a student is in a paired zone, a naturally desegregated zone or a zone receiving minority students. Such zone lines may be regarded as relatively more fixed, but they are not fixed and unchangeable. Eventually the School Board must assume the responsibility of school assignments. I recommend that while the Court maintains jurisdiction changes of this latter kind be by permission of the Court.

It is not intended to have students cross Valley Highway. The zone lines should be adjusted to the Highway whenever that is possible.

It may also be desirable to alter the zones along Cherry Creek Highway. The southern boundary of Moore may be established at First Avenue. The northern boundary of Knight may be Cherry Creek Highway. Those students north of Cherry Creek Highway that are assigned to Knight by grid may be rezoned to Steck or Carson. If there are other similar needed changes, the School Department should notify the Court so that they can be authorized.

<u>SCHOOLS PAIRED BY CLASSROOMS</u>.

<u>SCHOOLS AND CAPACITIES</u> (1-6)

| | ESTIMATED ENROLLMENTS | | SUGGESTED NUMBER OF CLASSROOMS |
|---|---|---|---|
| | <u>Minority</u> | <u>Anglo</u> | |
| Mitchell – Force<br>. 840 690 | | | |
| Mitchell | 370 | 5 | 16 classrooms |
| Force | 85 | 411 | 16 classrooms |
| Steele – Crofton<br>480 240 | | | |
| Steele | 28 | 179 | 8 classrooms |
| Crofton | 190 | 11 | 8 classrooms |
| Knight – Barrett<br>570 390 | | | |
| Knight | 15 | 195 | 8 classrooms |
| Barrett | 167 | 4 | 8 classrooms |
| Asbury – Whittier<br>420 510 | | | |
| Asbury | 27 | 284 | 10 classrooms |
| Whittier | 232 | 8 | 10 classrooms |
| University Park – Columbine<br>840 945 | | | |
| University Park | 28 | 406 | 14 classrooms |
| Columbine | 321 | 21 | 14 classrooms |
| Washington Park – Stedman<br>480 390 | | | |
| Washington Park | 15 | 349 | 12 classrooms |
| Stedman | 263 | 7 | 12 classrooms |

SCHOOLS PAIRED BY CLASSROOMS

Page Two

SCHOOLS AND CAPACITIES (1-6)

| | ESTIMATED ENROLLMENTS | | SUGGESTED NUMBER OF CLASSROOMS |
|---|---|---|---|
| | Minority | Anglo | |
| **Eagleton - Doull**<br>424 870 | | | |
| Eagleton | 311 | 114 | 17 classrooms |
| Doull | 50 | 450 | 17 classrooms |
| **Bryant-Webster - Gust**<br>480 720 | | | |
| Bryant-Webster | 398 | 84 | 16 classrooms |
| Gust | 83 | 447 | 16 classrooms |
| **Dennison - Fairview, Traylor, Greenlee**<br>480 397 600 735 | | | |
| Greenlee | 271 | 22 | 12 classrooms |
| Dennison | 26 | 251 | 9 classrooms |
| Fairview | 370 | 27 | 15 classrooms |
| Traylor | 43 | 514 | 18 classrooms* |

*6 classrooms with Fairview, 12 with Greenlee

| | Minority | Anglo | |
|---|---|---|---|
| **Johnson - Gilpin**<br>630 630 | | | |
| Johnson | 56 | 375 | 15 classrooms |
| Gilpin | 352 | 11 | 15 classrooms |
| **Hallett - Cory - Ashgrove**<br>540 540 720 | | | |
| Ashgrove | 26 | 343 | 12 classrooms |
| Cory | 16 | 143 | 6 classrooms |
| Hallett | 450 | 11 | 18 classrooms |

SCHOOLS PAIRED BY CLASSROOMS

Page Three

SCHOOLS AND CAPACITIES (1-6)

| | ESTIMATED ENROLLMENTS | | SUGGESTED NUMBER OF CLASSROOMS |
|---|---|---|---|
| | Minority | Anglo | |
| **Harrington - Wyatt - Ellis** 450 300 750 | | | |
| Wyatt | 157 | 4 | 7 classrooms |
| Ellis | 43 | 609 | 22 classrooms |
| Harrington | 359 | 18 | 15 classrooms |
| **Smith - Fallis - McMeen** 885 300 690 | | | |
| Fallis | 52 | 264 | 10 classrooms |
| McMeen | 48 | 410 | 15 classrooms |
| Smith | 596 | 13 | 25 classrooms |
| **Alcott - Smedley** 480 480 | | | |
| Alcott | 101 | 280 | 13 classrooms |
| Smedley | 319 | 96 | 13 classrooms |
| **Fairmont - Lincoln** 690 390 | | | |
| Fairmont | 314 | 86 | 13 classrooms |
| Lincoln | 118 | 249 | 13 classrooms |
| **Remington - Berkeley** 340 270 | | | |
| Remington | 205 | 76 | 9 classrooms |
| Berkeley | 53 | 194 | 9 classrooms |

Alcott - Smedley, Fairmont - Lincoln and Remington - Berkeley might use alternate assignment procedures as suggested in the preliminary plan presented by the Court Consultant.

SCHOOLS PAIRED BY CLASSROOMS

Page Four

Totals

| | |
|---|---|
| Minority in Anglo schools | 632 |
| Anglos in Minority schools | 830 |
| Minority in Minority schools | 4,807 |
| Anglos in Anglo schools | 5,699 |
| Minority Schools | 5,637 |
| Anglo Schools | 6,331 |
| Anglos | 6,529 |
| Minority | 5,439 |
| 55% Anglo | 11,968 |

SCHOOLS INTEGRATED WITH SHORT BUSING

| SCHOOL PLUS CAPACITY ESTIMATE | | | MINORITY | ANGLO | TOTAL | % |
|---|---|---|---|---|---|---|
| Stevens (285) | Main attendance area | | 25 | 169 | | |
| | Satellite E 1 | | 90 | 1 | | |
| | | Total | 115 | 170 | 285 | 60% |
| Bromwell (200) | Main attendance area | | 2 | 97 | | |
| | Satellite E 2 | | 68 | 16 | | |
| | | Total | 70 | 113 | 183 | 62% |
| Teller (370) | Main attendance area | | 50 | 204 | | |
| | Mitchell Grid | | 120 | 0 | | |
| | | Total | 170 | 204 | 374 | 55% |
| Steck (400) | Main attendance area | | 17 | 179 | | |
| | Ash Grove | | | 36 | | |
| | Satellite E 3 | | 150 | 13 | | |
| | | Total | 167 | 228 | 395 | 58% |
| Ebert (350) | Main attendance area | | 150 | 0 | | |
| | Air base | | | 190 | | |
| | | Total | 150 | 190 | 340 | 56% |
| Palmer (340) | Main attendance area | | 23 | 127 | | |
| | Ash Grove | | | 45 | | |
| | Satellite G 1 | | 134 | 13 | | |
| | | Total | 157 | 185 | 342 | 54% |
| Montclair (510) | Main attendance area | | 48 | 227 | | |
| | Ash Grove | | | 53 | | |
| | Satellite E 7 | | 170 | 5 | | |
| | | Total | 218 | 285 | 503 | 57% |
| Whiteman (460) | Main attendance area | | .20 | 87 | | |
| | Ash Grove | | | 163 | | |
| | Satellite E 5 | | 69 | 3 | | |
| | Air base | | 106 | | | |
| | | Total | 195 | 253 | 448 | 56% |
| Ellsworth (200) | Main attendance area | | 8 | 79 | | |
| | Ash Grove | | | 25 | | |
| | Satellite E 6 | | 83 | 3 | | |
| | | Total | 91 | 107 | 198 | 54% |

SCHOOLS INTEGRATED WITH SHORT BUSING

Page two

| SCHOOL PLUS CAPACITY ESTIMATE | | MINORITY | ANGLO | TOTAL | % |
|---|---|---|---|---|---|
| Carson (380) | Main attendance area | 20 | 211 | | |
| | Satellite E 4 | 92 | 6 | | |
| | Total | 112 | 217 | 329 | 66% |
| Moore (485) | Main attendance area | 79 | 241 | | |
| | Greenlee Satellite and part from G 2 | 130 | 13 | | |
| | Total | 209 | 253 | 462 | 55% |
| Emerson (255) | Main attendance area | 72 | 69 | | |
| | Greenlee Satellite | 37 | | | |
| | Air base | | 70 | | |
| | Total | 109 | 139 | 248 | 56% |
| Wyman (460) | Main attendance area | 106 | 91 | | |
| | Satellite G-2 | 113 | 14 | | |
| | Air base | | 128 | | |
| | Total | 219 | 233 | 452 | 52% |

| Rosedale 330 | MINORITY | ANGLO | | | TOTAL | % |
|---|---|---|---|---|---|---|
| Main attendance area | 68 | 191 | | | | |
| Satellite Fairview | 60 | 3 | | | | |
| Total | 128 | 194 | 322 | 60% | 0 0 0 | |

| Thatcher-McKinley 270 | MINORITY | ANGLO | | | TOTAL | % |
|---|---|---|---|---|---|---|
| Main attendance area | 61 | 192 | 253 | | | |
| Satellite Fairview | 25 | 0 | 25 | | | |
| Total | 86 | 192 | 278 | 69% | 0 0 0 | |

Schools Integrated by Rezoning

Projected Enrollments

| School and Capacity | Minority | Anglo | Total | % Anglo | Number to be Bused | | |
|---|---|---|---|---|---|---|---|
| | | | | | M | A | T |
| Columbian 360 | 191 | 161 | 352 | 46% | 0 | 0 | 0 |
| Beach Court 360 | 188 | 152 | 340 | 45% | 0 | 0 | 0 |
| Brown 450 | 233 | 213 | 446 | 48% | 0 | 0 | 0 |
| Edison 480 | 256 | 223 | 479 | 47% | 59 | 35 | 94 |
| Ashland 640 | 355 | 271 | 626 | 43% | 7 | 63 | 70 |
| Ashley 480 | 252 | 241 | 493 | 49% | 6 | 23 | 29 |
| Philips 480 | 219 | 224 | 443 | 51% | 0 | 0 | 0 |
| Park Hill 930 | 437 | 466 | 903 | 52% | 0 | 0 | 0 |
| Barnum | 144 | 128 | 272 | 47% | 0 | 0 | 0 |
| Munroe | 249 | 174 | 423 | 41% | 0 | 0 | 0 |
| College View 460 | 106 | 178 | 384 | 46% | 0 | 0 | 0 |
| Knapp 600 | 260 | 264 | 524 | 50% | 0 | 0 | 0 |
| Newlon 600 | 235 | 205 | 440 | 47% | 0 | 0 | 0 |
| Westwood 735 | 295 | 193 | 488 | 40% | 0 | 0 | 0 |
| Goldrick 690 | 188 | 229 | 417 | 55% | 0 | 0 | 0 |
| Godsman 480 | 251 | 362 | 613 | 59% | 150 | 30 | 180 |

Schools Integrated by Rezoning

Projected Enrollments

Page Two

| School and Capacity | Minority | Anglo | Total | % Anglo | Number to be Bused | | |
|---|---|---|---|---|---|---|---|
| | | | | | M | A | T |
| Sherman 240 | 62 | 91 | 153 | 59% | 0 | 0 | 0 |
| Schenck 600 | 142 | 283 | 425 | 67% | 0 | 0 | 0 |
| Valverde 540 | 239 | 265 | 504 | 53% | 50 | 100 | 150 |
| Colfax 390 | 110 | 106 | 206 | 52% | 0 | 0 | 0 |
| Cowell 450 | 177 | 133 | 310 | 43% | 0 | 0 | 0 |
| Schmitt 600 | 161 | 267 | 428 | 62% | 0 | 0 | 0 |

ASSIGNMENTS OF MINORITY CHILDREN WHO WILL ATTEND
COLE AND MANUAL AT THE JUNIOR AND SENIOR
HIGH SCHOOL LEVELS

| Schools and Capacity | Enrollments in Attendance Zone | | Receives from Satellite F | Total | % A |
|---|---|---|---|---|---|
| | M | A | | | |
| Sabin 1170 | 35 | 469 | 375 | 879 | 53% |
| Kaiser 735 | 25 | 485 | 225 | 735 | 68% |
| Holm 735 | 35 | 551 | 150 | 736 | 75% |
| Samuels 735 | 42 | 619 | 75 | 736 | 84% |
| Pitts 390 | 10 | 273 | 100 | 383 | 71% |
| Bradley 810 | 19 | 589 | 170 | 778 | 78% |
| Slavens 600 | 24 | 476 | 100 | 600 | 79% |

4847

SCHOOLS NOT INTEGRATED BECAUSE OF
SPECIAL PROGRAMS OR INACCESSIBILITY

| | | |
|---|---|---|
| Swansea – Elyria | 416 | 155 |
| Cheltenham | 464 | 185 |
| Del Pueblo | 337 | 20 |
| Garden Place | 220 | 39 |

Junior High Schools.

Junior High Schools have been desegregated by establishing new attendance zones and by defining satellite zones. There are satellites in the southern areas of the City which consist of those attendance zones which received minority students at the elementary level. Students residing in those attendance zones will attend junior high schools which were predominantly minority. There are also satellites in minority areas. Students residing in these areas are assigned to junior high schools which are predominantly Anglo. All of the zones for the junior high schools have been prepared using the grid data base. Thus a zone is defined by the grids included within it. In some instances grid zone lines nearly correspond to present attendance zone lines. The School Department may move grid zone lines to present attendance zone lines so long as there is no substantial change in the resulting number of students residing within the area. The School Department should be directed to make adjustments in the satellites in minority neighborhoods so that insofar as possible students already being bused to predominantly Anglo junior high schools will continue to attend the same schools. This can be done without substantial alteration in the number of minority students assigned to each school. At the junior high school level two miles is a reasonable walking distance under ordinary circumstances, although it is a long walk. When students are reassigned so that they reside within easy walking distance of one school, say less than a mile, for example, but their reassigned school is perhaps one and one-half to two miles away; then people understandably feel unfairly treated. Such students should be provided with transportation. I recommend: First that transportation be provided for all students residing more than two miles from their assigned school, and second, that transportation be provided for all students within a mile of one school who are assigned to a school more than a mile and a half from their home and in all instances where the reassignment has created a hardship in reaching the new school assignment.

I have assigned the area south of the Lowry Air Force Base to the Byers-Baker attendance area, but the School Department may prefer to assign those students to Hill. That would enable all of the students in the Byers-Baker attendance zone to attend Baker. If the School Department wishes to use both the Byers and the Baker school, they will have to establish zones within the combined attendance zone which result in enrollments at each school so that each school enrolls substantially the same percentage of minority students.

When Cole opens in September, 1974, it will no longer be a minority junior high school. Its faculty should look like any other faculty in any other junior high school. Not only is this important to the image of Cole, but also is it important that faculty experienced in teaching minority children be available to all the junior high schools in the city. They provide the nucleus for helping other teachers largely unfamiliar with the needs of minority children. I am sure the School Department is aware of this problem and will take the needed appropriate steps, but the Court may want to request that the School Department submit their plans for faculty changes.

## PROJECTED ENROLLMENT - JUNIOR HIGH SCHOOLS

| School and Capacity | | Minority | Anglo | Total |
|---|---|---|---|---|
| Byers-Baker 2195 | Main Attendance Area | 562 | 585 | |
| | Area South of Air Force Base | 37 | 169 | |
| | Total | 599 | 754 | 1353 |
| Grant 810 | Main Attendance Area | 88 | 358 | |
| | Satellite | 231 | 5 | |
| | | 319 | 363 | 682 |
| Hamilton 1560 | Main Attendance Area | 32 | 421 | |
| | Satellite | 240 | 17 | |
| | | 272 | 438 | 710 |
| Hill 1485 | Main Attendance Area | 91 | 746 | |
| | Satellite | 424 | 13 | |
| | | 515 | 759 | 1274 |
| Cole 1725 | Main Attendance Area | 655 | 8 | |
| | Satellite | 44 | 766 | |
| | | 699 | 774 | 1473 |
| Kennedy (Henry) 1600 | Main Attendance Area | 45 | 800 | |
| | Satellite | 335 | 64 | |
| | | 380 | 864 | 1244 |
| Kepner 1710 | Main Attendance Area | 863 | 890 | 1753 |
| Kunsmiller 1815 | Main Attendance Area | 184 | 873 | |
| | Satellite | 208 | 10 | |
| | | 392 | 883 | 1275 |
| Lake 1380 | Main Attendance Area | 477 | 405 | 882 |
| Mann 1155 | Main Attendance Area | 494 | 296 | |
| | Satellite | 17 | 244 | |
| | | 511 | 540 | 1051 |

Projected Enrollment
Junior High Schools
Page 2

| School and Capacity | | Minority | Anglo | Total |
|---|---|---|---|---|
| **Merrill** | | | | |
| 1455 | Main Attendance Area | 23 | 585 | |
| | Satellite | 397 | 21 | |
| | | 420 | 606 | 1026 |
| **Morey** | | | | |
| 1200 | Main Attendance Area | 620 | 249 | |
| | Satellite | 12 | 336 | |
| | | 632 | 585 | 1217 |
| **Place** | | | | |
| 1230 | Main Attendance Area | 49 | 787 | |
| | Satellite | 216 | 7 | |
| | | 265 | 794 | 1059 |
| **Rishel** | | | | |
| 1230 | Main Attendance Area | 631 | 624 | 1255 |
| **Skinner** | | | | |
| 1185 | Main Attendance Area | 617 | 613 | 1230 |
| **Smiley** | | | | |
| 1635 | Main Attendance Area | 668 | 426 | |
| | Montbello | 297 | 215 | |
| | | 965 | 641 | 1606 |
| **Gove** | | | | |
| 790 | Main Attendance Area | 215 | 272 | |
| | Satellite | 13 | 341 | |
| | | 228 | 613 | 841 |

Desegregation of High Schools.

The grid map has been used to develop new attendance zones for high schools in Denver. Large numbers of students will continue to attend the high school they now attend. There are 18,000 students enrolled in high school. Some 12,000 of these will be continuing on next year. Of this 12,000, between 2,500 and 3,000 will be assigned to a different high school.

Two satellites are in Anglo areas, one assigned to Manual High School and one assigned to East. One of these satellites is in an area that received one-way bused students during the elementary years. The other is a large area in the East and East Central part of the city that is assigned to Manual High School, the school that is presently all minority. There are satellites in minority neighborhoods for South, George Washington, Kennedy and Jefferson. Sixteen hundred minority students (not counting Montbello) will go to predominantly Anglo high schools. Of these 1,600, approximately 700 are already attending these schools.

Considerable attention has been given to the problem of integrating Manual High School. There has been extensive discussion and study of the various procedures which might be followed. Some of the Denver teachers and administrators believe the community can best be served by maintaining Manual as a high school offering special programs which might attract students on a city-wide basis. Others feel (the Manual teachers themselves are exactly evenly divided on this issue) that the school can only be and should be integrated by assigning white students to the school. Manual High School is to be congratulated for the variety of innovated programs that it has developed, but I believe the students and community can best be served if all high schools offer the kinds and varieties of programs now available at Manual. An attendance zone has been developed for Manual. With the assignment of students to Manual as herein proposed, there will no longer be any black high school in the city. It is my recommendation that the school department take the necessary steps to make Manual a comprehensive high school equal in quality and program to all the other high schools in the city. The special programs at Manual, including what are sometimes called "alternate learning projects", should in part be continued at Manual, but similar programs should also be made available in all of the city's high schools.

Desegregation of Faculty.

The faculty now at Manual are those experienced in teaching the minority black students. With desegregated high schools, such teachers should be with minority students in all of the schools. In September, 1974, the faculties in each of the high schools should be a fairly representative cross section of the entire high school staff. The School Department should give assurances to the Court that they intend to accomplish this, or they should be directed by the Court to present their plans for faculty.

High School Transportation.

Transportation should be provided for all high school students who are assigned to schools more than three miles from their home.

HIGH SCHOOL ZONES

Estimated School Enrollments

| School and Capacity | Minority | Anglo | Total | Percent Anglo |
|---|---|---|---|---|
| **East – Manual** | | | | |
| 3960 Main Attendance Area | 1273 | 1340 | 2613 | |
| Satellite | 20 | 300 | 320 | |
| | 1293 | 1640 | 2933 | 56% |
| **East Manual Sub-zones** | | | | |
| East Main Attendance Area | 755 | 650 | 1405 | |
| Satellite | 20 | 300 | 320 | |
| | 775 | 950 | 1725 | 55% |
| Manual Main Attendance Area | 457 | 11 | 468 | |
| Satellite | 61 | 679 | 740 | |
| | 518 | 690 | 1208 | 57% |
| **North** | | | | |
| 2430 Main Attendance Area | 989 | 1021 | 2010 | 51% |
| **West** | | | | |
| 2100 Main Attendance Area | 642 | 549 | 1191 | 46% |
| **George Washington** | | | | |
| 2520 Main Attendance Area | 108 | 1412 | 1520 | |
| Satellite | 650 | 29 | 679 | |
| | 758 | 1441 | 2199 | 65% |
| **South** | | | | |
| 2460 Main Attendance Area | 98 | 1260 | 1358 | |
| Satellite | 433 | 58 | 491 | |
| | 531 | 1318 | 1849 | 71% |
| **Abraham Lincoln** | | | | |
| 2460 Main Attendance Area | 409 | 1974 | 2383 | 82% |
| **John F. Kennedy** | | | | |
| 1622 Main Attendance Area | 236 | 1091 | 1327 | |
| Satellite | 341 | 38 | 379 | |
| | 577 | 1129 | 1706 | 67% |
| **Thomas Jefferson** | | | | |
| 2130 Main Attendance Area | 51 | 1297 | 1348 | |
| Satellite | 186 | 9 | 195 | |
| Montbello | 169 | 115 | 284 | |
| Total | 406 | 1421 | 1827 | 78% |
| OVERALL TOTAL ... | 5605 | 10493 | 16098 | |
| Computer Count of Total Students | 5907 | 10479 | 16386 | |
| Actual Total Present Enrollment September 1973 | 6353 | 12007 | 18360 | 65% |

Zone Changes at the Junior and Senior High Schools.

The School Department has filed some objections to the zones at the junior and senior high school levels. Projected enrollments probably fall short of actual enrollments. The zones should be viewed as suggestive, not definitive. If the School Department has different preferred zones, they should be free to adopt them just so long as they meet the overall requirements of the court that all schools be within the range of 40% to 70% Anglo. The projected enrollments for Gove and Morey are pressing the capacities of those buildings. Some of those students could be temporarily diverted to Hill or Cole pending completion of the new Gove. When the new Gove is completed, adjustments should be made in Smiley, Morey, Gove, Cole, and Hill so that none exceeds 50% minority. If they wish to make adjustments for the coming year, they should be free to do so.

Transportation.

There is no better way to assure parental dismay with a desegregation plan than to have an unreasonable and unworkable transportation network. Bus failures, off-schedule buses, excessively long bus rides obviously create citizen discontent which may be misdirected at the Court rather than at the inefficiency of the transportation system. Efficient transportation systems cost more money and require more school buses. One can save transportation expenses by staggering the opening and closing hours of schools and by running tight schedules without back-up buses but obviously such practices can create parental discontent if there is much deviation from normal opening and closing hours or buses fail to arrive. At the junior and senior high school level buses need to be provided so that students can participate in after-school activities without being penalized.

If the School Board is not willing to offer assurances to the Court that they will take their responsibility of providing an effective and efficient transportation system, I recommend that the School Department be directed to submit to the Court its transportation plans in sufficient detail that they can be evaluated by transportation specialists. The Court could then request the General Assistance Center at the University of Northern Colorado to have an evaluation made of the proposed transportation. This should not delay in any way the implementation of the Court's Order since the School Department will not defer its procurement of additional buses pending approval of its transportation plans. I presume the School Department already knows how many additional buses they need both to do the task right and to do it ineptly.

April 8, 1974

Dear Judge Doyle:

There are one or two details that were not attended to prior to my submitting my report to you.

1. There is an error on page 6. Force should read 85–411.

2. I neglected to adjust the enrollments in Morey and Gove. I recommend that until the new Gove is completed some of the Gove satellite be diverted to Cole. If 150 students were so diverted and the boundary between Gove and Morey adjusted, all of the junior high schools will have appropriate enrollments. If the school department feels that we are putting too many students into Cole they could also use some of Hill and temporarily assign some students, Anglo and minority, from Cole to Hill.

3. I am somewhat concerned that I have over enrolled the schools that receive one-way bused children in the southern part of the city. It is a problem with a simple solution. There are a number of under enrolled nearby schools: University Park, Doull and others. Excess students, Anglo and their bused in associates, can be diverted to one of the other schools but would not participate in the pairing. The students that would go to different schools would be the ones already riding buses.

Sincerely,

John A. Finger, Jr.

## Modifications

## to

## Alleviate Overcrowding in Certain

## Junior High Schools

---

Defendants have objected to overcrowded conditions in the following schools:

> Rishil
> Kepner
> Skinner
> Morey

The following changes may be made to alleviate unnecessary overcrowding:

1) Grid #13 West #5 North, containing 34 minorities and 14 Anglos, will attend Kepner rather than Rishil.

2) Grid #12 West #1 South, containing 28 minorities and 17 Anglos, will attend Kepner rather than Rishil.

3) Grid #14 West #6 North, containing 96 minorities and 16 Anglos, will attend Lake rather than Kepner.

4) Grid #12 West #5 South, containing 14 minorities and 31 Anglos, will attend Kunsmiller rather than Kepner.

5) Grid #13 West #5 South, containing 25 minorities and 49 Anglos, will attend Kunsmiller rather than Kepner.

The above changes will effectuate the following results:

| | M | | A | | T | Anglo % |
|---|---|---|---|---|---|---|
| Rishil 1230 | 631 | | 624 | | 1255 | |
| | -34 (to Kepner) | | -14 (to Kepner) | | -48 | 51% |
| | 597 | | 610 | | 1207 | |
| Kepner 1710 | 863 | | 890 | | 1753 | |
| | -96 (to Lake) | | -16 (to Lake) | | -112 | |
| | 767 | | 874 | | 1641 | |
| | +62 (from Kepner) | | +31 (from Kepner) | | +93 | |
| | 829 | | 905 | | 1734 | 51% |
| | -39 (to Kunsmiller) | | -80 (to Kunsmiller) | | -119 | |
| | 790 | | 825 | | 1615 | |

---

### ORDER

Pursuant to Rules 59 and 60 of the Federal Rules of Civil Procedure, the court does hereby open the judgment herein for the purpose of amending a finding and conclusion as follows:

Paragraph 3–F of the Decree is modified to read as follows:

F. Defendants have the option of establishing an alternate program of vocational courses either at Manual or at other premises to meet specific needs

**726**

for such courses, provided, however, that if such alternate programs of vocational courses are carried out at Manual, the overall minority enrollment for Manual High School plus any alternate programs on the premises is not to exceed 44%.

In further clarification and to remove any doubt, it is further ordered that that part of the court's opinion pertaining to the operation of the East-Manual complex is hereby adopted; defendants are directed to carry out fully this program for conducting the East and Manual High Schools on a campus basis. This is to be regarded as an essential and highly important part of the desegregation programs at East High School and Manual High School.

The order opening the judgment is for the above purposes only, and the Clerk is directed to enter judgment in accordance with the above amendments.